Judgment rendered January 13, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 53,728-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                         Appellee

versus

RICHARD ALLEN McLENDON               Appellant

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Bossier, Louisiana
Trial Court No. 222,268

Honorable Michael O. Craig, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By:  Douglas Lee Harville

J. SCHUYLER MARVIN                         Counsel for Appellee
District Attorney

JOHN M. LAWRENCE
DALE N. MONTGOMERY, II
Assistant District Attorneys

* * * * *

Before MOORE, PITMAN, and STONE, JJ.

**PITMAN, J**.

A jury convicted Defendant Richard Allen McClendon of second degree murder. The trial court sentenced him to life in prison without benefit of probation, parole or suspension of sentence. Defendant appeals. For the following reasons, we affirm Defendant's conviction and sentence.

## FACTS

On September 17, 2018, the state filed a bill of indictment alleging that on or about June 15, 2018, Defendant committed the second degree murder of Steven Beaird and that he had the specific intent to kill or inflict great bodily harm, contrary to La. R.S. 14:30.1.

On December 16, 2019, the state filed a notice of intent to introduce an inculpatory statement made by Defendant. That same day, a hearing was held to determine the admissibility of a recorded interview Defendant gave to Det. Tim Wooten and Lt. Matthew Gaydos of the Bossier Parish Sherriff's Office following his arrest on June 15, 2018. A video recording of Defendant's statement was viewed by the court. The recording showed that prior to the interview, Lt. Gaydos advised Defendant of his constitutional rights, and Defendant confirmed that he understood them. Defendant then signed the waiver of rights form and agreed to speak with the officers. During the course of the interview, which lasted approximately three hours and 45 minutes, Defendant asked several times for water and to go to the restroom. The officers provided him with water and allowed him to use the restroom. Det. Wooten testified that Defendant freely and voluntarily gave his statement and that he was not under any duress or given any threats or promises. He could not recall if other witnesses mentioned that Defendant smoked methamphetamine or drank alcohol earlier that day, but he noted

that Defendant was able to talk and spoke freely during the interview. Det. Wooten acknowledged that other witnesses stated that Defendant did not always make sense when he spoke. He noted that Defendant appeared to be able to think rationally, because he changed his story as the officers revealed additional evidence. Det. Wooten testified that, in his experience, someone who was too inebriated to give a statement would not be able to "catch onto things that quickly." The trial court found that Defendant's statements were freely and voluntarily made; and, therefore, the video of the interview was admissible at trial.

The trial began on December 17, 2019. Kelly Kennedy testified that at approximately 5:00 a.m. on June 15, 2018, she was awakened by the sound of a motorcycle. From a window, she observed a motorcycle drive past her house at 291 Parker Road toward a cul-de-sac at the end of the road. The motorcycle turned around and drove back past her house toward Bellevue Road. Approximately 30 to 45 seconds later, she heard and saw two motorcycles driving past her house toward the cul-de-sac. She heard "pop, pop, pop" and told her husband that she thought someone had just been shot. She then saw one motorcycle drive past her house toward Bellevue Road, and she recorded a video of this motorcycle with her cellphone, which was played for the jury. She never saw the second motorcycle pass in front of her house again. She then called 911 to report the shooting. She testified that she could not tell if the first motorcycle drove by a second time with another motorcycle or if she saw three different motorcycles.

Jason Kennedy testified that at approximately 5:00 a.m. on June 15, 2018, his wife Kelly Kennedy woke him up when she heard motorcycles and

2

gunshots on their road. He drove his truck toward the cul-de-sac and saw that a man on a motorcycle had been shot. He knew that his wife had called 911, so he stayed with the man until help arrived. He stated that several other people arrived at the scene, including a "distraught" man who thought the person who had been shot might be his brother. A woman who drove to the scene told them, "it's not him."

Lori Lambert testified that on June 15, 2018, she lived at 691 Parker Road, which is on the cul-de-sac. At approximately 5:00 a.m., she heard and observed a motorcycle drive up to her house and then turn around and drive away. She noted that the motorcycle sounded like a Harley Davidson. She then heard and observed two motorcycles in front of her house. She heard four "pops" that sounded like gunshots and saw one person fall over onto the ground and the other person leave by motorcycle. She then called 911 and went outside to see if she could help the person who was shot.

Edwin Tilden testified that on June 15, 2018, he was awakened by Lambert telling him that someone was shooting a gun in front of their house and a person got shot. Through a window, he saw a motorcycle driving away. He then went outside and approached a person on the ground near a motorcycle. Tilden stated that several people gathered at the scene, including a man who was concerned the person who had been shot was his brother. He noted that a car drove up to the scene and a woman got out of the vehicle. Once she learned the victim was not her brother, she got back in the vehicle and drove away in order to avoid law enforcement.

Paul Zimmerman testified that on June 15, 2018, he lived at 625 Parker Road and was awakened at 5:00 a.m. by a loud noise. From a window, he saw two small vehicles going by at a high speed toward the

3

cul-de-sac. He stepped outside and heard multiple gunshots from what sounded like a small-caliber weapon. He took cover and then saw a person driving away on a motorcycle. He saw a man running toward the end of the road who said that someone shot his brother. He observed two people drive up to the scene, and a man exited the vehicle and a woman drove away.

Jim Berridge testified that at approximately 5:00 a.m. on June 15, 2018, he was walking his dog and had turned onto Vickers Road from Bellevue Road when he heard two motorcycles traveling on Bellevue Road at a high speed. He noted that one motorcycle was significantly louder than the other and that they were not traveling side by side. Based on what he could hear of the motorcycle noise, he thought the motorcycles had turned onto Parker Road, which ran parallel to Vickers Road. He then heard three gunshots and the not-as-loud motorcycle leaving the area.

Waynette Dupuy testified that on June 15, 2018, she and her brother lived in separate residences at 3549 Bellevue Road. At approximately 5:15 a.m., she heard someone knocking on the door. Through her window she saw Defendant at the door, but she did not answer the door. She observed him knock on her brother's door and then leave the property by motorcycle.

Wayne Ebarb testified that he owned a motorcycle salvage business and Defendant was an employee on and off for two years. He stated that he loaned his Honda 1100 Shadow to Defendant for several months and that Defendant was using it in June 2018. He explained that the 1100 Shadow is a "fairly loud" motorcycle, but not as loud as a Harley-Davidson.

Ofc. Larry Weaver testified that on June 15, 2018, he worked for the Bossier Parish Sheriff's Office in the patrol division. At 5:02 a.m., he was

4

dispatched to Parker Road with the information that shots had been fired, a person was injured and to be on the lookout for a motorcycle leaving the scene. While en route to Parker Road, he observed a motorcycle, and his dashcam video that showed he passed someone driving a motorcycle. This video was played for the jury.

Det. Wooten testified that he was the lead detective in the investigation of Beaird's shooting. An arrest warrant was obtained and executed for Defendant, and Det. Wooten and Lt. Gaydos interviewed him on June 15, 2018. A video of the three hour and 45-minute interview was played for the jury. Defendant stated that he was 54 years old and worked at Ebarb's Cycle Shop. He admitted that he used methamphetamine and drank alcohol that morning.

Defendant stated that he had been dating Shannon Clark for about three months and was staying at her house on Kent Road. He had known Beaird for a month, and Clark previously dated Beaird. Defendant knew that Beaird went to Clark's house two or three times a week, but he stated it did not bother him. He wondered if they still had a sexual relationship, but claimed he was not jealous. Defendant admitted that he and Beaird bought and sold dope. He stated that several weeks prior, there was some tension with Beaird because he owed Beaird money for dope, but the tension ended when he paid Beaird. The officers told Defendant that witnesses told them that Beaird taunted him, bullied him, threatened him and his family and was having sex with his girlfriend. However, Defendant insisted that everything was fine between him and Beaird.

Defendant recounted his actions beginning the night of June 14, 2018. Around 10:00 p.m., he and Beaird went to the Goldmine Casino and saw his

brother.  Around 12:00 a.m., he and Beaird went to Art Davis's house on Highway 157.  Between 12:30 and 1:00 a.m., Beaird left to meet a man on Parker Road to get dope, and Defendant stayed at Davis's house because his motorcycle had a flat tire and broken valve stem.  He left the motorcycle, which belonged to Wayne Ebarb, at Davis's house.  Robert Smith, the brother of Defendant's ex-girlfriend, picked Defendant up from Davis's house.  Defendant then asked Smith to take him to Clark's house.  He noted that on the way to Clark's house, they stopped at a Circle K.  He denied stopping anywhere else, including anywhere on Bellevue Road.

Defendant told officers that he knew Beaird was dead, but did not know he had been shot in the head while on his motorcycle on Parker Road.  He stated that he did not have a cell phone and that Clark called his brother, who told him that Beaird had been shot.

The officers told Defendant that a man on Bellevue Road heard two motorcycles, one that was much louder than the other, and the officers suggested that Beaird was driving a Harley-Davidson and Defendant was driving a Honda.  Defendant denied this.  They told him that they had video of someone wearing his helmet and clothing and driving his motorcycle on Parker Road just after Beaird was shot.  They also told Defendant that they had a video of him driving past officers on Bellevue Road just after Beaird was shot.

Defendant stated that he always carries a gun and that he just bought a red revolver with a black handle, maybe a .38; that he shot it that day; and that he left it under a seat in Smith's truck.  He admitted that he fled when he passed officers on Bellevue Road because he had a gun and dope on him, the motorcycle was illegal and he did not have a driver's license.

6

Throughout the interview, Defendant repeatedly denied driving his motorcycle on Parker Road and shooting Beaird. The officers told Defendant that they knew that he was lying to them and that if his family was also lying to them, they could be charged with accessory after the fact.

Det. Wooten, who was accepted as an expert in cell phone tower detection, testified that he obtained records of cell phone data from Smith's cell phone. The data revealed that on June 15, 2018, Smith was at his residence until just before noon when he traveled to Davis's residence on Highway 157; he then went to Sandra Albright's residence at 12:15 p.m. and remained there until 2:08 p.m.; he then was at or near his house from 2:16 p.m. to 2:31 p.m.; and after traveling on Roy Road, he then arrived at Clark's residence on Kent Road at 2:57 p.m. and left at 3:55 p.m. On September 17, 2018, Det. Wooten obtained an arrest warrant for Smith for obstruction of justice due to his failure to disclose to law enforcement information about the murder weapon. He later agreed to cooperate with the investigation. Six months after the murder, Smith led the officers to a location off Roy Road where he saw Defendant discard a gun and a hat. Det. Wooten testified that officers recovered a gun, which was engraved with "The Pink Lady," and a hat.

Det. Wooten also testified that Defendant's sister lived with her boyfriend on Parker Road and told officers that she recognized the sound of Defendant's motorcycle on Parker Road on the morning of June 15, 2018. She thought Defendant had been in an accident at the end of the road, which is why she and her boyfriend went to the scene. Det. Wooten stated that during the investigation he received information that Beaird was selling methamphetamine. He testified that no blood was found on Defendant's

motorcycle, only Defendant's own blood was found on his clothing and none of Beaird's blood was found on Defendant.

Robert Smith testified that on June 15, 2018, his sister called him between 11:00 a.m. and 12:00 p.m. and asked him to give Defendant a ride. He agreed because he hoped that Defendant might give him some dope in return. Smith picked up Defendant from a location on Highway 157. Defendant asked Smith if he wanted to smoke, so they drove to Albright's house, and the three of them smoked methamphetamine. Smith testified that Defendant repeatedly spoke about a "Pink Lady" and that it "smoked his ass." He did not know what Defendant meant by these statements. He noticed that Defendant was "blabbering" and talking to himself and wanted to watch the news. Smith stated that they remained at Albright's house for about 35 to 45 minutes, but admitted that it could have been a few hours.

Smith testified that after they left Albright's house, he and Defendant stopped for gas at a Circle K on Highway 80 and then Defendant asked him to drop him off at Clark's house. On the way, Defendant told Smith that he had to get rid of something and showed him a gun. They drove onto a dirt road, and Defendant took a hat from Smith's vehicle, put the gun inside the hat and tossed them out of the window. They then went to Clark's house. Smith identified the gun that Defendant showed him and tossed from the vehicle window.

Smith acknowledged that he had prior convictions for felony possession, misdemeanor theft and domestic abuse battery. He confirmed that he was charged with obstruction of justice in this case and spent three months in jail before he agreed to cooperate with the investigation.

8

Sandra Albright testified that at approximately 10:45 a.m. on June 15, 2018, Defendant and Smith arrived at her door. She thought Defendant's demeanor was odd and noted that he was laughing so hard he was almost crying. She stated that she, Defendant and Smith smoked methamphetamine together. Defendant asked her if she had heard what happened to Beaird last night. When she replied she had not, Defendant told her that someone "smoked him." She was not sure what this meant and hoped it referred to smoking marijuana. She noted that Defendant then said that he would "smoke anybody" and that he would smoke Albright and Smith "if he felt like he had to." He also told her that people will say things behind your back, but not to your face. He then said people behaved that way because "they can't say anything anymore. They won't ever say anything again." He also said "if you owe you got to pay." Albright testified that Defendant babbled to himself and said a lot of things that did not make sense.

Albright further testified that Defendant wanted to watch the local news and said "it ought to be coming on the news about right now." He then mumbled to himself, "you better watch out before you say too much in front of these people." He also told her, "you would be looking like this too if it was your first murder." At that point, she wondered if Beaird was dead. Defendant and Smith stayed at her house for approximately two hours. As he was leaving, Defendant again asked her if she heard about Beaird. She asked Defendant if he meant that Beaird was dead, and he replied "that's exactly what I'm saying." She acknowledged that she had three felony convictions for methamphetamine and that she had last used methamphetamine about a week before trial, but not on the day of her testimony.

Art Davis testified that on June 15, 2018, Defendant and Beaird arrived at his house at 2:00 a.m. on motorcycles, and Defendant was driving a Honda Shadow. He stated that they stayed two to three hours and had drinks and talked. The back wheel of Defendant's motorcycle was low, so he added some air to it before Defendant and Beaird left. He testified that he never saw Beaird again, but that Defendant returned a few hours later, between 8:00 and 9:00 a.m. Defendant's rear tire was low again, and when he (Davis) attempted to add air to it, he broke the valve stem, rendering the motorcycle undrivable. He denied washing Defendant's motorcycle. Defendant left his house around 11:30 a.m.

Jerri Craig testified that she lived on Highway 157 with Davis. On June 15, 2018, Defendant arrived at their house between 2:30 and 3:30 a.m. and was accompanied by Beaird, whom she had never met before. Defendant and Beaird left on motorcycles at approximately 5:00 a.m. Defendant returned later that morning, helped pressure wash the house and stayed for approximately two hours. Defendant borrowed Craig's cell phone to call someone for a ride and left when a man arrived to pick him up.

Kelly Tullis testified that Shannon Clark is her sister, that she had known Defendant for 37 years and that she had known Beaird for five or six years. She added that Beaird was best friends with her sister's deceased husband. She stated that Beaird gave methamphetamine to Clark, and Clark shared it with her. She testified that there was animosity between Defendant and Beaird because of a "bad dope deal," which took place about a week and a half before the events of June 15, 2018. Defendant told her that he owed Beaird money for drugs and that Beaird called him and threatened to kill Defendant and his family if he did not pay Beaird the money he owed him.

10

Defendant showed her his gun and told her several times that he was going to kill Beaird. She only saw the handle of the gun and noted that it was black. She stated that Beaird often came to Clark's house between 3:00 and 4:00 a.m. and would taunt Defendant by sitting right next to Clark. Tullis testified that she saw Beaird and Defendant at Clark's house around midnight on June 15, 2018, and that they left around 12:45 a.m. on motorcycles. She did not warn Beaird about Defendant's intent to kill him.

Kristen Faulkner testified that Beaird was her best friend and lover since he was released from jail in 2014. She noted that Beaird was having sex with other people, including Clark. She testified that Beaird used and sold methamphetamine and provided it to Clark. She stated that the night before his death, Beaird was trying to collect money he loaned people.

Shannon Clark testified that prior to June 15, 2018, she had known Defendant for about four weeks and, in that time, they started dating and living together. Beaird was best friends with her deceased husband, and she and Beaird had been best friends for about four or five years. She admitted that both Beaird and Defendant supplied her with methamphetamine. Defendant asked her about her relationship with Beaird and if it was sexual. The night before Beaird's death, she ended her relationship with Defendant and told him to leave because of his suspicious and confusing behavior. She testified that the night of Beaird's murder, she was sleeping and did not know if Beaird and Defendant were at her house.

Clark further testified that she had never seen Defendant with a gun, but a few days before Beaird was shot, Defendant told Clark that he had a gun. Clark corroborated Smith's testimony that he brought Defendant to her house on June 15, 2018. Clark already knew Beaird was dead when they

11

arrived, and Defendant told her he played no part in the death. Clark told Defendant that law enforcement had called to talk to him. They then left her house to purchase alcohol. While driving in the car, they were stopped by law enforcement.

Dr. Frank Peretti was accepted as an expert in the field of forensic pathology. He conducted Beaird's autopsy and testified that Beaird's cause of death was multiple gunshot wounds, which were made to the left eye, the right side of the chest and the right groin. He recovered three bullets from Beaird's body. He noted that the evidence on the body indicated that the gun was fired from a distance greater than two feet from the victim. He testified that Beaird's toxicology report revealed marijuana and a high concentration of methamphetamines.

Det. Latricia Thomas Savage of the Bossier Parish Sheriff's Office testified that on January 29, 2019, she recovered a pink revolver and a hat from an area off Roy Road. She identified the revolver, the hat and photographs of the revolver. The photographs showed that the gun was a Charter Arms revolver with a black handle, a pink-red body and a silver barrel engraved with the words "The Pink Lady." She noted that the revolver and the hat were submitted to the crime lab.

Det. Jonathan Jackson of the Bossier Parish Sheriff's Office testified that he assisted in processing the scene on June 15, 2018. He recovered Beaird's clothing and a bullet from the saddle bag on his motorcycle.

Richard Beighley was accepted as an expert in firearms identification. He stated that he test-fired the .38 caliber Charter Arms revolver recovered by the sheriff's office. He noted engravings on the gun barrel that read "The Pink Lady," and ".38 Special." He compared bullets from the test-fire to the

three bullets recovered from Beaird's body and found that two of the bullets from Beaird's body had similar characteristics to those fired from the gun recovered and determined that they were all fired from the same gun. The third bullet recovered from Beaird's body could not be excluded, but lacked sufficient individual markings to identify it as having been fired from the same gun. Beighley noted that the rifling characteristics of the .38 caliber gun were "very unique," in that it had eight lands and grooves and a left-hand twist. He testified that in his research, the only .38 caliber revolver with those rifling characteristics is a Charter Arms revolver.

Sgt. Cesar Mora of the Bossier Parish Sheriff's Office testified that on June 15, 2018, he responded to Davis's house on Highway 157 and recovered a Honda Shadow motorcycle. He noted that the rear tire was flat. He could not recall if the motorcycle appeared to have been recently washed and could not recall the results when he investigated the license plate tag.

Det. Becky Fohl of the Bossier Parish Sheriff's Office testified that on June 15, 2018, she processed the scene at Parker Road. She identified the photographs she took, which showed the deceased and his motorcycle, blood stains on his clothing, a hole in his helmet visor and blood inside his helmet.

Robert McClendon, Jr. testified that he is Defendant's brother and lives at 535 Parker Road with other family members. He stated that approximately three months before the incident in this case, Defendant told him that Beaird had threatened to "take out" everybody on "the hill," meaning their family who lived on Parker Road. In the late hours of June 14, 2018, or the early hours of June 15, 2018, he saw Defendant and Beaird at the Goldmine Casino; and, when they were leaving, he witnessed Defendant hug Beaird for a long time, which was unusual behavior and

13

caused him to worry that Defendant might be in danger. Defendant told him that he was going down Highway 157 for a minute and then he and Beaird would come eat breakfast with him. He made breakfast and waited for Defendant, but he never arrived, which worried him. His sister came to the door and told him that Defendant had been shot, so they drove to the end of the road. When he arrived at the scene, he realized it was not his brother, but was Beaird. His sister left in the car, and he remained with Beaird to help him "be comfortable" because he was still breathing and no one else was trying to help.

The state recalled Det. Wooten to testify. He identified maps depicting Highway 157, Bellevue Road, Vickers Road and Parker Road. He noted the short distance between Davis's house on Highway 157 and Bellevue Road and pointed out the intersections of Vickers Road and Parker Road with Bellevue Road.

The state rested, and the defense recalled Kelly Tullis. She stated that she did not warn Beaird about Defendant's threats because she did not have Beaird's cell phone number and her sister would not give it to her. She denied that she told law enforcement that Beaird and Defendant sold dope for the Bandidos motorcycle club. She stated that she knew Beaird and Defendant sold methamphetamine, but did not know from whom they got it or to whom they sold it.

The defense recalled Det. Wooten. He testified that on June 15, 2018, Tullis gave a recorded statement in which she told officers that Beaird and Defendant were not members of the Bandidos, but that they were used by the Bandidos to deal methamphetamine so that the gang would not be associated with drug dealing.

14

On December 19, 2019, a unanimous jury found Defendant guilty as charged of second degree murder.

A sentencing hearing was held on March 10, 2020. The trial court imposed the mandatory sentence of life imprisonment at hard labor, without benefit of probation, parole or suspension of sentence.

Defendant appeals.

## DISCUSSION

### *Sufficiency of the Evidence*

In his first assignment of error, Defendant argues that the state presented insufficient evidence to prove beyond a reasonable doubt that he murdered Beaird. He contends that facts overlooked or not accepted by the jury established a reasonable hypothesis of his innocence, i.e., that someone other than Defendant was with Beaird on Parker Road when Beaird was shot and killed. He emphasizes testimony that there could have been three different motorcycles on Parker Road that morning.

The state argues that it presented sufficient evidence to prove beyond a reasonable doubt that Defendant shot and intentionally killed Beaird. It contends that the inferences drawn from the circumstantial evidence presented at trial left no reasonable hypothesis of innocence and established Defendant's guilt beyond a reasonable doubt.

The standard of review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Hearold*, 603 So. 2d 731 (La. 1992); *State v. Smith*, 47,983 (La. App. 2d Cir. 5/15/13), 116 So. 3d

884.  *See also* La. C. Cr. P. art. 821.  This standard does not provide an appellate court with a vehicle for substituting its appreciation of the evidence for that of the fact finder.  *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517.  The trier of fact makes credibility determinations and may accept or reject the testimony of any witness.  *State v. Casey*, 99-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000).  The appellate court does not assess credibility or reweigh the evidence.  *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442.

The *Jackson* standard is applicable in cases involving both direct and circumstantial evidence.  *State v. Allen*, 36,180 (La. App. 2 Cir. 9/18/02), 828 So. 2d 622, *writs denied*, 02-2595 (La. 3/28/03), 840 So. 2d 566, and 02-2997 (La. 6/27/03), 847 So. 2d 1255, *cert. denied*, 540 U.S. 1185, 124 S. Ct. 1404, 158 L. Ed. 2d 90 (2004).  An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in a light most favorable to the prosecution.  *Id.*  When the direct evidence is thus viewed, the facts established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. *Id.*

Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience.  *State v. Broome*, 49,004 (La. App. 2 Cir. 4/9/14), 136 So. 3d 979, *writ denied*, 14-0990 (La. 1/16/15), 157 So. 3d 1127.  If a case rests essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; *State v. Broome*, *supra*.

La. R.S. 14:30.1(A)(1) defines second degree murder as the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm.

Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Defendant committed the essential elements of second degree murder. Further, the evidence excluded every reasonable hypothesis of innocence.

The direct and circumstantial evidence presented at trial established that Defendant was with Beaird in the hours before the murder; that Defendant was in the proximity of the murder scene at Parker Road immediately before and after the murder; that Defendant acted to evade law enforcement; and that Defendant possessed and disposed of the gun used to shoot and kill Beaird. Defendant's specific intent to kill Beaird was established by the fact that he shot Beaird in the left eye, the right side of the chest and the right groin.

Accordingly, this assignment of error lacks merit.

*Introduction of Statements*

In his second assignment of error, Defendant argues that the trial court erred when it allowed the introduction of his involuntary statements. He contends that the state failed to prove the free and voluntary nature of his incriminating statement and that the conduct of the interviewing officers during the interview undermined his ability to give a knowing and intelligent waiver of his rights. He states that he asked for water three times, but was only given water once and that his requests for food and use of a restroom were denied. He also finds fault with the interviewing officers' threats to

arrest his family. He notes that the officers knew he had smoked methamphetamine earlier that day and was not speaking in a logical manner.

The state argues that it proved Defendant's statement was given freely and voluntarily and was not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises.

Before what purports to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. R.S. 15:451. The state must also establish that an accused who makes a statement during custodial interrogation was first advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). *State v. Roddy*, 33,112 (La. App. 2 Cir. 4/7/00), 756 So. 2d 1272, *writ denied*, 00-1427 (La. 5/11/01), 791 So. 2d 1288. When deciding whether a statement is knowing and voluntary, a court considers the totality of circumstances under which it is made, and any inducement is merely one factor in the analysis. *State v. Blank*, 04-0204 (La. 4/11/07), 955 So. 2d 90, *cert. denied*, 552 U.S. 994, 128 S. Ct. 494, 169 L. Ed. 2d 346 (2007); *State v. Platt*, 43,708 (La. App. 2 Cir. 12/3/08), 998 So. 2d 864, *writ denied*, 09-0265 (La. 11/6/09), 21 So. 3d 305.

Testimony of the interviewing police officer alone may be sufficient to prove that the statement was given freely and voluntarily. *State v. Henderson*, 31,986 (La. App. 2 Cir. 8/18/99), 740 So. 2d 240.

The admissibility of a confession or statement is in the first instance a question for the trial court. *State v. Sanders*, 52,632 (La. App. 2 Cir. 5/22/19), 273 So. 3d 635, *writ denied*, 19-01106 (La. 7/17/20), 298 So. 3d

169. The trial court's conclusion on the credibility and weight of testimony relating to the voluntariness of a confession for the purpose of admissibility is entitled to great weight and will not be overturned on appeal unless it is not supported by the evidence. *State v. Benoit*, 440 So. 2d 129 (La. 1983); *State v. Sanders*, *supra*.

A review of the record establishes that the interviewing officers properly advised Defendant of his rights and that his statement was given freely and voluntarily and was not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. The recorded video of the interview shows that an officer advised Defendant of his rights, and Defendant stated that he understood them and signed the waiver form. Det. Wooten testified that Defendant freely and voluntarily gave his statement and that he appeared to be able to think rationally and answered the questions asked of him. The state met its burden of proof, and the trial court did not err in finding Defendant's statement to be admissible.

Accordingly, this assignment of error lacks merit.

### CONCLUSION

For the foregoing reasons, we affirm the conviction and sentence of Defendant Richard Allen McClendon.

**AFFIRMED.**