Judgment rendered June 29, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 54,577-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

CHARLES KENNELL                             Appellant

* * * * *

Appealed from the
Fifth Judicial District Court for the
Parish of Franklin, Louisiana
Trial Court No. 2019-139F

Honorable John Clay Hamilton, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Peggy J. Sullivan

PENNY WISE DOUCIERE                  Counsel for Appellee
District Attorney

CAROLINE HEMPHILL
AMANDA MICHELE WILKINS
Assistant District Attorneys

* * * * *

Before MOORE, COX, and THOMPSON, JJ.

**COX, J.**

This case arises out of the Fifth Judicial District Court, Franklin Parish, Louisiana. Charles Kennell ("Kennell") was charged with one count of second degree murder in violation of La. R.S. 14:30.1, and one count of possession of a firearm by a convicted felon, in violation of La. R.S. 14:95.1. After a jury trial, a unanimous guilty verdict for both charges was returned, and Kennell was subsequently sentenced to mandatory life imprisonment at hard labor for second degree murder and 20 years at hard labor for possession of a firearm by a convicted felon and ordered to pay the mandatory minimum fine of $1,000; each sentence was to be served concurrently and without benefit of probation, parole, or suspension of sentence.

Kennell now appeals, challenging the sufficiency of the evidence for his second degree murder charge and the trial court's denial of the proffered testimony. For the following reasons, we affirm Kennell's convictions and sentences. We also order that the trial court minutes be amended to reflect the sentencing as imposed in the record.

**FACTS**

On March 21, 2019, Kennell was indicted by a grand jury on one count of second degree murder, and one count of possession of a firearm by a convicted felon, for the murder of Quintail Credit ("Credit") on February 20, 2019.[1] Kennell filed a motion to suppress his statements from his interview with Franklin Parish Sheriff's Office investigators on February 20, 2019. At the hearing on January 5, 2021, the State introduced the video and

---

[1] On April 2, 2019, Kennell was arraigned and entered a plea of not guilty.

transcript of the interview, and the trial court heard testimony from Deputy Sheriff Chief Investigator Todd Daniel Roberts ("Major Roberts") and Deputy Sheriff Captain Kevin Bass ("Cpt. Bass").

Major Roberts testified that after officers received a tip about Kennell's location, he found him at 270 Willow Street, a few blocks away from the crime scene. When he arrived, Precious Jones ("Jones"), Kennell's girlfriend, told him that the only people inside were her child and a friend; however, after she let him search the home, she stated that her boyfriend was also there. Jones opened the bathroom door and revealed Kennell sitting on the toilet with no clothes on. Major Roberts told Kennell that he was not under arrest at that time, but handcuffed and Mirandized him while he and the other officers searched the home where he found a plastic bag with wet clothes underneath a pile of baby's clothing. After his identity was confirmed identity with the ID found in the bag, Kennell was taken to the Sheriff's Office where he was given a rights form.

The State then presented a video of Kennell's interview and Major Roberts identified himself and Cpt. Bass in the video. He stated that Kennell initially denied any involvement in the incident and requested a lawyer. Kennell then asked if he was under arrest, and Major Roberts told him that he was under arrest for second degree murder. Kennell asked for a lawyer again and Major Roberts and Cpt. Bass ceased questioning and left the room. Kennell was allowed to speak with Jones and after he was done, he expressed that he wanted to talk with both officers again. Major Roberts stated he Mirandized Kennell again, and Kennell voluntarily admitted that he shot Credit and stated that he did so because it looked as if Credit was grabbing or reaching for a gun. Major Roberts testified that Kennell was not

2

promised or given any incentive to talk about the incident and no one used any physical violence against him.

Cpt. Bass[2] testified that after he explained Kennell's charges, he asked Kennell if Credit had a weapon. He replied that Kennell's only answer was that he saw Credit reach toward his waist, and the motion made Kennell believe that Credit had a gun. Cpt. Bass stated that he helped search the crime scene, but no weapon was ever recovered. Finally, Cpt. Bass reiterated that no threats, promises, or inducements were made to elicit a statement from Kennell.

The trial court dismissed the motion to suppress finding that Kennell's statements were freely and voluntarily given, in part, because Kennell was not harassed, beaten, threatened, or cajoled into speaking with the officers. The trial court noted that after Kennell requested a lawyer, the interview stopped and only continued when Kennell stated he wanted to talk. The trial court then denied Kennell's motion for change of venue, and trial commenced on July 19, 2021, where the following testimony and evidence was presented to the jury:

First, Michael Credit ("Mr. Credit"), Credit's father, testified that around noon on February 20, 2019, he went to Mathis Credit's[3] home near 145 Washington Street and talked to Credit for approximately 15 to 20 minutes. While they spoke, he stayed in his vehicle, a white Yukon, and Credit leaned into the window. Mr. Credit stated that at some point, he noticed a man, whom he later identified as Kennell, walk up the street, slow

---

[2] Cpt. Bass testified that he was the Deputy Sheriff Investigator for Franklin Parish Sheriff's Office.

[3] Mathis Credit is Mr. Credit's brother.

3

his pace, and continuously look over at him and Credit. He stated that after Kennell passed his vehicle, he walked some distance, turned around, and hollered, "What's up?" and Credit responded in the same way. Mr. Credit stated that because he didn't know Kennell and was unsure whether Credit knew him, he started "fooling around" with his radio.

He stated that he heard Credit say, "What's up, man?" before he yelled that Kennell had a gun. Mr. Credit explained that when he looked up, he heard two gunshots, and from his rearview mirror, saw Credit run behind his vehicle and attempt to run toward Mathis' home before he fell face down into a ditch. Mr. Credit stated that after he exited the vehicle, he saw Kennell standing over Credit, firing approximately "four or five" shots into Credit's back before fleeing. After the State introduced surveillance video from Shaw's Corner store, which was near the area, Mr. Credit confirmed that Kennell was the man seen in the video. He then testified that, to his knowledge, Credit did not normally carry a weapon, that he was unarmed, and that no one removed a weapon from the area. He also stated that he did not hear Credit make any threats or see him make any threatening gestures.

Next, Cpt. Bass testified that he was the lead investigator for the case. He stated that when he arrived at the scene, he found Credit's body face down in a ditch and began to photograph and search the area for evidence. Cpt. Bass stated that he found fired shell casings in the middle of the street, just east of Mr. Credit's vehicle, in a linear path as if the person who fired them had been moving. He stated that he also found an unfired casing near Credit's body, and all other casings he found were in the yard of the house on 145 Washington Street. After the State introduced photographs of the bullets found at the scene, Cpt. Bass stated that, based on his experience, he

4

could determine that the bullets were .40 caliber. He also noted that he never found any other weapon or any different shell casings.

After the introduction of the surveillance video from Shaw's Corner store, Cpt. Bass identified Kennell and explained that as Kennell walked north, he could be seen looking back constantly in the direction of Mr. Credit's vehicle. Kennell could then be seen crossing the street and approaching the vehicle, where shortly after he made a gesture before retrieving a gun, firing it, and running south, which was consistent with the linear pattern of the shell casings he found. Cpt. Bass then identified Kennell's clothing from the video, which consisted of a dark-colored shirt, cap, and jeans with patches on the knees and thighs, and stated that Kennell's gun had an attachment on the bottom.

Cpt. Bass then testified that during the investigation, he was informed that a black male in a blue truck picked Kennell up and that the owner of the truck lived on Willow Street in a brick home. He stated that although they never saw a blue truck on Willow Street, he did see a brick home with shell casings in the driveway that matched the casings found at the scene. After Jones let him inside, he and Major Roberts told him he found Kennell, and they identified him as the man seen in the surveillance video. He stated that during the search, officers also found a set of wet clothing that matched the ones seen in the video.

He stated that after Kennell was arrested, he spoke with Prezel Martin ("Martin"), who lived a street over from the scene of the crime, before he went to a trailer home east of Martin's home. He stated that the officers pulled back the tin paneling of the home and found a Glock Model 22, .40 caliber Glock, which was similar to the gun on the surveillance video. At

5

this time, the State then presented a video collected from the Ring camera of Keiona Wesby's, Martin's neighbor, home. Cpt. Bass testified that in this video, seven gunshots are heard before Kennell is seen running across Martin's yard. He noted that the number of gunshots heard and the pauses between each were significant because it confirmed the number of shells he found at the scene.[4]

Outside of the presence of the jury, Cpt. Bass testified as to the origin of the .40 caliber Glock used in this case. He stated that this particular weapon was stolen from New Orleans and noted that Kennell was also from New Orleans. On cross-examination, Cpt. Bass confirmed that the only witness to the incident was Mr. Credit and that the only video evidence of the incident came from Shaw's surveillance video and Kieona Wesby's Ring camera.

Next, Troy Kendall Stracener ("Stracener"), an expert in firearm analysis, testified that he worked for the North Louisiana Crime Lab in West Monroe. He stated that he examined the recovered .40 caliber Glock, the six fired .40 caliber cartridge cases,[5] three bullets, and five cartridge cases. The State then submitted, and Stracener identified, four of the fired .40 caliber cartridge cases into evidence. Stracener explained the process he used to determine whether the cartridges and bullets were fired from the .40 caliber Glock. He stated that he performed four test fires of the weapon in question, and compared those test fires to the submitted evidence.

---

[4] Cpt. Bass explained that the pauses between fires likely meant that there was a misfire and that Kennell would have had to rack the gun back and release it in order to fire again.

[5] He noted that of the six fired .40 caliber cartridge cases, one cartridge had a firing pin impression that indicated that it had been misfired.

6

In comparing them, he explained that he looks for the same individual markings on the fired cartridge cases and the bullets to determine if they were fired from the same weapon; if the same markings from the submitted evidence and the test fires were not present, he could then determine that bullets and cartridges were not fired from that weapon. Stracener stated that after comparing the six fired .40 caliber cartridge cases to the test fires, he found that the cartridges were fired from the same .40 caliber Glock. He stated that although the test fire bullets did not have sufficient reproducibility to make a comparison to the evidence bullets, he determined that the two bullets recovered from Credit's body had the same class characteristics[6] as the test fire bullets. Stracener stated that in his opinion, the only firearm that the fired cartridges could have been shot from was the .40 caliber Glock.

Martin testified that on February 20, 2019, he was standing in his backyard around midday "messing around" when he heard gunshots. A few moments after he heard the gunshots, he saw a man with a gun run through

---

[6] Stracener clarified that bullet class characteristics determine the caliber, type of rifling present, and the twist present on the bullet. He stated that fired cartridge cases determine:

> [F]iring pin impression, shape, size, individual markings, you have markings on the breech face, certain markings on the breech face as far as ejector and extractor marks. Those would be considered class characteristics.

> The individual characteristics are the microscopic markings, individual markings that are left when that bullet goes down the barrel and the barrel leaves those markings on a bullet, or when the fired cartridge case when the cartridge is actually fired well the force pushes it back against the breech of the firearm itself and that breech leaves those individual markings, or the firing pin will leave individual markings. But in this case[,] the bullets did not reproduce, there were not enough–there was insufficient individual markings for me to say that they were reproducible, thus all I can say is that they are [the] same class.

his yard, jump his fence, and run to the other side of his house toward a nearby trailer home. The State then presented the video from the Ring camera. After identifying the man in the video as the one he saw on the day in question, Martin testified that he saw the man run through a nearby spillway, pull back the tin paneling of the trailer home, and throw the gun underneath the home. Martin admitted that although he could not provide officers with a physical description of the man, he stated that he remembered the gun the man carried and stated that it was automatic, black, and had a laser attachment.

Next, Jennifer Forsyth ("Dr. Forsyth"), an expert in forensic pathology, who performed Credit's autopsy, testified that his cause of death was multiple gunshot wounds. She explained that during her examination she documented three gunshot entrance wounds: (1) on the right temple region of Credit's head that exited on the left side of his forehead; (2) on the right buttock, where the bullet was found next to his femur; and (3) on the posterior of Credit's right thigh. Dr. Forsyth stated that although she could not determine which wound was inflicted first, she could confirm that the wounds entered through Credit's back, the projectiles were recovered anterior to those entrances, and each contributed to Credit's death.

Finally, Brittain Vercegeay ("Vercegeay"), Kennell's probation officer, testified that at the time of the incident, Kennell was on probation for three years following his sentence for simple robbery and possession of stolen property on December 20, 2017, and that Kennell was not scheduled to complete his full term until January 2021. He stated that he was unaware that Kennell was in Franklin Parish because Kennell did not have permission to leave New Orleans where he was sentenced.

8

Next, the State introduced pictures of the bullets found at the scene and Major Roberts testified that one of the markers in the picture identified a spent .40 caliber hull and the other was a .40 caliber bullet that had been fired but did not discharge because the firing pin struck the primer. He explained that this meant that the person who fired the gun would have had to eject the bullet, where it would have fallen on the ground, in order to fire the gun again. Major Roberts then reiterated his testimony from the motion to suppress and explained that during his investigation, he was given a tip that the person responsible for the shooting was a man named Charles and that he left the scene in a blue truck and headed toward Willow Street. He stated that he was initially looking for a blue truck at a brick home, but stopped at 270 Willow Street because he saw shell casings in the driveway that matched the ones found at the scene.

Major Roberts explained that Jones allowed him and the other officers to search the home where he eventually found Kennell and a bag of wet clothes that matched the clothing seen on the surveillance video. He testified that after Kennell was arrested, and during his interview, he admitted that he shot Credit, fled the scene, and dropped his gun before he swam across a creek and fled to the house on 270 Willow Street. Kennell stated that he was walking to a friend's home when he saw Credit, and because of a prior altercation he had with Credit and two other men, he wanted to let Credit know that he was not afraid of him. Kennell stated that he shot Credit because Credit made a grabbing motion under his shirt as if he had a gun. On cross-examination, Major Roberts testified that, based on the location of the bullets and misfired cartridges, he would have logically

9

concluded that the person who shot Credit stood over his body and fired down at him.

Defense counsel then moved for a proffer of proof, and the jury was removed; at the conclusion of the proffer, the trial court denied the admissibility of the testimony defense counsel sought to introduce. The jury then returned a unanimous verdict of guilty for both counts. On September 14, 2021, the trial court, after reviewing Kennell's PSI, sentenced him to mandatory life imprisonment at hard labor for second degree murder and 20 years at hard labor for possession of a firearm by a convicted felon and ordered him to pay the mandatory minimum fine of $1,000, each to be served concurrently and without the benefit of probation, parole, or suspension of sentence. Kennell now appeals.

**DISCUSSION**

*Sufficiency of the Evidence*

In his first assignment of error, Kennell argues that the evidence presented at trial was insufficient to support his conviction for second degree murder. He argues that the State failed to negate the possibility that he acted in self-defense because the surveillance footage the State partially relied on was visually limited and did not show the entirety of his encounter with Credit. Specifically, Kennell contends that he only fired his gun because Credit lifted his shirt, and made a grabbing motion as if he were going to retrieve a gun; however, Credit's actions were concealed by Mr. Credit's vehicle.

Alternatively, Kennell argues that, at most, he should have been convicted of manslaughter, claiming that he acted in sudden passion and/or heat of blood, the basis for which is discussed in greater detail in his second

10

assignment of error.  Kennell argues that he and Credit had been involved in a previous altercation, during which Credit allegedly stated that he would kill Kennell the next time he saw him.  He contends that this statement, coupled with Credit purportedly making a grabbing motion under his shirt served as the catalyst for the shooting.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Steines*, 51,698 (La. App. 2 Cir. 11/15/17), 245 So. 3d 224, *writ denied*, 17-2174 (La. 10/8/18), 253 So. 3d 797.  This standard, now codified in La. C. Cr. P. art. 821, does not afford appellate courts with a means to substitute its own appreciation of the evidence for that of the fact finder.  *Steines*, *supra*.

The *Jackson* standard is applicable to cases involving both direct and circumstantial evidence.  An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution.  When the direct evidence is thus viewed, the facts established by the direct evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime.  *State v. Sutton*, 436 So. 2d 471 (La. 1983).

Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred

11

according to reason and common experience. *State v. Broome*, 49,004 (La. App. 2 Cir. 4/9/14), 136 So. 3d 979, *writ denied*, 14-0990 (La. 1/16/15), 157 So. 3d 1127. If a case rests essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; *Broome, supra*; *State v. Gipson*, 45,121 (La. App. 2 Cir. 4/14/10), 34 So. 3d 1090, *writ denied*, 10-1019 (La. 11/24/10), 50 So. 3d 827.

Appellate courts neither assess the credibility of witnesses nor reweigh evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. Rather, the reviewing court affords great deference to the jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Gilliam*, 36,118 (La. App. 2 Cir. 8/30/03), 827 So. 2d 508, *writ denied*, 02-3090 (La. 11/14/03), 858 So. 2d 422. Where there is conflicting testimony concerning factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Allen*, 36, 180 (La. App. 2 Cir. 9/18/02), 828 So. 2d 622, *writ denied*, 02-2595 (La. 6/27/03), 847 So. 2d 1255.

In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Elkins*, 48,972 (La. App. 2 Cir. 4/9/14), 138 So. 3d 769, *writ denied*, 14-0992 (La. 12/8/14), 152 So. 3d 438; *State v. Wiltcher*, 41,981 (La. App. 2 Cir. 05/09/07), 956 So. 2d 769. When a defendant challenges both the sufficiency of the evidence, and other trial errors, the reviewing court first reviews sufficiency, as a failure to satisfy the sufficiency standard will moot trial errors. *State v. McGee*, 51,977 (La. App. 2 Cir. 4/3/19), 316 So. 3d 1196.

In the present case, Kennell was convicted of second degree murder in violation of La. R.S. 14:30.1, which is defined, in pertinent part, as "the killing of a human being: (1) When the offender has a specific intent to kill or inflict great bodily harm[.]" Regarding Kennell's claim that he should have been convicted of the lesser offense of manslaughter, La. R.S. 14:31(A) provides, in pertinent part, that:

> (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood had actually cooled, at the time the offense was committed; or

> (2) A homicide committed, without any intent to cause death or great bodily harm.

Accordingly, for murder to be reduced to manslaughter, the following must be proved: (1) the homicide was committed "in sudden passion or heat of blood"; (2) that sudden passion or heat of blood was immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection; (3) the defendant's blood did not cool between the provocation and the killing; and (4) an average person's blood would not have cooled between the provocation and the killing. *McGee, supra; State v. Efferson*, 52,306 (La. App. 2 Cir. 11/14/18), 259 So. 3d 1153.

A defendant who claims provocation, as a means of reducing murder to manslaughter, bears the burden of proving these elements by a preponderance of the evidence; additionally, provocation and the time for cooling are questions for the jury to determine according to the standard of the average or ordinary person. *State v. Leger*, 05-0011 (La. 7/10/06), 936

13

So. 2d 108, *cert. denied*, 549 U.S. 1221, 127 S. Ct. 1279, 167 L. Ed. 2d 100 (2007); *McGee, supra.*

However, when self-defense is raised, the State must prove, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. *State v. Allen*, 50,703 (La. App. 2 Cir. 8/10/16), 200 So. 3d 376, *writ denied*, 16-1734 (La. 9/6/17), 224 So. 3d 981. The aggressor or person who creates a difficulty cannot claim self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict. La. R.S. 14:21. Not every act of a defendant will make him or her an aggressor. It is the character of the act coupled with the intent of the defendant that determines whether the defendant is the aggressor. *McGee, supra*; *See, State v. Spivey*, 38,243 (La. App. 2 Cir. 5/12/04), 874 So. 2d 352.

Here, we find that there was sufficient evidence to support Kennell's conviction for second degree murder; namely, the surveillance video from the corner store, the Ring video from a nearby residence, as well as the testimony from Mr. Credit and Major Roberts sufficiently established that Kennell had the specific intent to kill or inflict great bodily harm on Credit. First, the surveillance video from the corner store showed Kennell, who was walking in the opposite direction of where Credit stood, slow down, notice Credit, and without provocation, actively turn around and approach Credit; thereafter, Kennell is shown pulling out a firearm and firing it multiple times as he chased Credit.

Mr. Credit testified that he heard Credit yell that Kennell had a gun and then attempt to run as Kennell fired two shots. He stated that after he saw Credit fall face down into a ditch, he witnessed Kennell stand over

Credit's body and fire approximately "four or five" shots into Credit's back. Moreover, Cpt. Bass testified that the video from the Ring camera was significant because several shots can be heard around the time in which the incident occurred. He explained that based on the number of shells and spent casings found at the scene and the pauses heard in the Ring video, the shooter would have had to take the time to "rack [the gun] back and release it again" in order to shoot again.

In viewing the evidence in the light most favorable to the prosecution, we find that any rational trier of fact could have found beyond a reasonable doubt that the State proved the essential elements of second degree murder in this case.

In this case, Kennell admitted that he shot and killed Credit; however, he maintains that his actions were justified because he shot Credit in self-defense. We disagree and find that the record shows that the State's evidence sufficiently negated the possibility that Kennell acted in self-defense when he shot Credit, who was unarmed, multiple times. Although Kennell argues that Credit acted as if he was grabbing a gun, this statement is uncorroborated; however, even if we assume that Credit did make this motion, we cannot say that Kennell was subsequently justified in pursuing and shooting Credit multiple times. Specifically, we note that the surveillance footage established that after Kennel pulled out a gun, Credit fled from him and Kennell is thereafter seen chasing Credit and firing the gun multiple times.

Mr. Credit testified that at no point did Credit have a weapon and importantly stated that he saw Credit run away from Kennell before he fell face down into a ditch. He stated that while Credit was still down, Kennell

15

stood over him and fired multiple gunshots into Credit's back before fleeing the scene. Major Roberts stated that, based on his view of the scene and the position of the bullets, it appeared as if the shooter was positioned over the body and, finally Dr. Forsyth confirmed that Credit was shot three times in the back. Given the aforementioned testimony, we find that Credit attempted to withdraw and disengage from any contact with Kennell, such that Kennell's actions could not be seen as an act of self-defense.

Kennell's alternate argument that he should have been convicted of manslaughter is also without merit primarily because the only evidence that supports a verdict of manslaughter is Kennell's self-serving and uncorroborated statement that Credit acted as if he were reaching for a gun when Kennell shot him. Although discussed in further detail in Kennell's second assignment of error, we note that there is no evidence to establish that Credit acted in any manner that would have reasonably provoked Kennell. Kennell argues that Credit previously threatened to kill him during an altercation; we note that this incident occurred two months prior to the present incident such that Kennell had an ample cooling off period. Witnesses also testified that Credit was unarmed, and there was no corroborating testimony that Credit made any threatening gestures toward Kennell.

Accordingly, we find that the jury acted within its discretion in finding that Kennell was guilty as charged rather than guilty of manslaughter.

*Admissibility of Proffered Testimony*

In his second assignment of error, Kennell argues the trial court erred in precluding the introduction of testimonial evidence regarding a previous

16

altercation with the victim. Kennell asserts that testimony from defense witness, Bre Andria Robinson, would have supported his assertion that Credit had previously threatened him and established Credit's bad character; and because the trial court ruled the evidence inadmissible, it unfairly restricted his ability to present his self-defense claim.

The foundation for the admissibility of such evidence is La. C.E. art. 404, which provides, in pertinent part:

> **A. Character evidence generally.** Evidence of a person's character or a trait of his character, such as a moral quality, is not admissible in a civil or criminal proceeding for the purpose of proving he acted in conformity therewith on a particular occasion, except:
>
> . . .
>
> **(2) Character of victim.** (a) Except as provided in Article 412, evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provide that in the absence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible.
>
> **B. Other crimes, wrongs, or acts.** (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.
>
> . . .
>
> (2) In the absence of a hostile demonstration or overt act on the part of the victim at the time of the offense charged, evidence of the victim's prior threats against the accused or the accused's state of mind as to the victim's dangerous character is not admissible.

Although evidence of a person's character or trait of his character is generally inadmissible to prove that he acted in conformity therewith on a particular occasion, it may be introduced to support a self-defense plea. *See* La. C.E. art. 404(A)(1)(a). In such circumstances, a defendant is entitled to introduce evidence of the decedent's prior threats or violent character "for two distinct purposes: (1) to show defendant's reasonable apprehension of

17

danger which would justify his conduct; and (2) to help determine who was the aggressor in the conflict." *State v. Burton*, 19-01079 (La. 6/30/21), 320 So. 3d 1117, *citing State v. Lee*, 331 So. 2d 455, 460 (La. 1975).

However, victim character evidence is admissible only if the accused first produces evidence that the victim made a hostile demonstration or an overt act against the accused at the time of the incident. *Burton, supra; State v. Johnson*, 41,428 (La. App. 2 Cir. 9/27/06), 940 So. 2d 711. An overt act is "any act of the victim which manifests in the mind of a reasonable person a present intention on his part to kill or do great bodily harm." La. C. E. art. 404; *Johnson, supra*. Moreover, evidence tending to establish an overt act must be "appreciable." *Id*. When appreciable evidence of the overt act is presented, the trial court cannot infringe on the fact-finding function of the jury by disbelieving the defense testimony and thereby deny the accused a defense permitted to him by law. *Id.; State v. Lee, supra*. Thus, the threshold inquiry is whether the defendant presented evidence of a "hostile demonstration or an overt act on the part of the victim."

In brief, Kennell notes that the Louisiana Supreme Court in *State v. Williams*, 19-00490 (La. 4/3/20),---So. 3d---,2020 WL 1671569, reiterated that a "trial court is not entitled to exercise a credibility determination to refuse the defendant the right to have the jury determine the merits of [his] plea of self-defense." In *Williams, supra*, the trial court prohibited the defendant from introducing evidence of the victim's prior threats because the only evidence before the court establishing an overt act by the victim was the eyewitness testimony which the trial court determined lacked credibility because he provided contradictory statements on several occasions prior to trial. The Court found that the defendant presented

sufficient evidence of an overt act to warrant admission of character evidence and that while "the evidence of an overt act is almost certainly worthy of disbelief by a jury. . . it still qualifies as appreciable within the meaning of the article as interpreted by the jurisprudence." *Williams*, *supra*.

Likewise, in *Burton*, *supra*, the Court found that the trial court erred in excluding evidence of the victim's dangerous character and in making a credibility determination to exclude the admission of the evidence, in part, because the defendant presented sufficient evidence of an overt act by the victim; namely, that the defendant claimed that he was justified in shooting the victim because the victim charged at him with a knife, and a witness further corroborated the defendant's testimony. The Court found that such evidence was relevant to the issue of whether the homicide was justifiable.

In the present case, Kennell alleged that Credit made a grabbing motion underneath his shirt as if reaching for a gun, and this action constituted an overt act on the part of Credit. Moreover, he asserts that Robinson's testimony would have confirmed his belief that Credit was reaching for a gun when he purportedly made the grabbing motion and was justified in shooting him. We disagree and reiterate that the threshold inquiry for the introduction of such evidence is whether the defendant presented evidence of a "*hostile demonstration or an overt act on the part of the victim*" and note that a defendant's unsupported, self-serving testimony which is sufficiently contradicted by other evidence does not constitute "appreciable evidence" of an overt act or hostile demonstration on the part of the victim. *See State v. Hardeman,* 467 So. 2d 1163 (La. App. 2 Cir. 1985).

Kennell maintains that there is no evidence to contradict his statement because Mr. Credit, the only witness to the incident, was "fooling around" with his radio, he could not testify as to any movements Credit made; moreover, Mr. Credit's vehicle blocked Credit such that the surveillance footage could not show any movements he made. He further contends that Robinson's testimony formed the basis for finding that he was reasonably afraid of Credit and consequently justified in shooting him. The only evidence purporting to show an overt act by Credit at the time of the incident is Kennell's own self-serving statement to Major Roberts and Cpt. Bass that Credit made a grabbing motion as if he were reaching for a gun.

Absent Kennell's own self-serving statement to Major Roberts and Cpt. Bass that Credit made a grabbing motion under his shirt, there is no other evidence corroborating this purported movement. Mr. Credit specifically testified that although he was "fooling around" with his radio when Kennell pulled out his gun, he never heard Credit make any threats, he was unarmed, and did not normally carry a gun. Likewise, Major Roberts testified that no other weapon was recovered at the scene or found on Credit's person. Notably, according to Kennell's statements and the surveillance footage, he never saw Credit with a gun, and although Credit attempted to flee the scene, Kennell chased after Credit and fired his gun at him multiple times. Accordingly, we find that Kennell's self-serving statements alone do not constitute appreciable evidence of an overt act under La. C.E. art. 404(B)(2) to warrant the introduction of Robinson's testimony.

Even if Kennell met his burden, Robinson's testimony does not purport to establish that Kennell acted out of a reasonable fear that Credit would hurt him. During proffer, Robinson testified that on December 15,

2018, Jones held a birthday party for her child at Pizza Hut where she, Fredrick Cooks, and Kennell were in attendance. Robinson stated that she heard Fredrick make a phone call and shortly after, Credit and another man, Cedric Cooks, arrived. She stated that although Fredrick, Cedric, and Credit argued with Kennell, she never heard any party make any threats. Moreover, she testified that after a manager asked the men to leave, Cedric hit Kennell, and she provided a statement to officers attesting to this fact.

Although Kennell argues that this testimony shows his fear of Credit, we find that Robinson's statements directly contradict this assertion as she specifically testified that she never heard anyone make any threats and that she only heard Credit yell that he "didn't bring them up here to fight; I didn't mean for this to go down like this." Robinson also testified that it was Cedric rather than Credit who hit Kennell, and notably, Major Roberts also testified that Kennell stated that he believed it was Cedric who hit him rather than Credit. Kennell's actions on the day in question undermine his contention that Robinson's testimony established that he was afraid of Credit. Specifically, Kennell noticed Credit and without provocation, approached him to, according to Major Robert's testimony, show that he was not afraid of Credit, and then proceeded to pursue and shoot Credit multiple times.

Because there is no evidence that Credit fought or threatened Kennell, we find that Kennell drawing his gun on Credit some two months after the altercation at the Pizza Hut is insufficient to establish that Credit had any dangerous characteristics and could not serve as a hostile demonstration or overt act toward Kennell where the only established act by Credit was being present during an altercation two months prior to the instant offense and

21

allegedly reaching under his shirt. Accordingly, the trial judge did not err in concluding there was no "appreciable evidence" of an overt act to justify the admission of the testimonial evidence. Therefore, this assignment of error is without merit.

*Error Patent Review*

Review of the record reveals that the trial court imposed both sentences without the benefit of parole, probation, or suspension of sentence. However, the minutes fail to note the restrictions of benefits.

We hereby order that the trial court minutes be amended to reflect the sentencing as imposed in the record. *See State v. Shelton*, 50,851 (La. App. 2 Cir. 9/28/16), 207 So. 3d 549.

## CONCLUSION

For the foregoing reasons, Kennell's conviction and sentence are affirmed.

**AFFIRMED, ORDERED TO CORRECT MINUTES.**

22