GARRETT, J. •
|TThe defendant, Wanda Gail Broome, was convicted of one count of possession of a Schedule III controlled dangerous substance (“CDS”), hydrocodone, and one count of distribution of a Schedule III CDS, hydrocodone. She was adjudicated a fourth felony offender and was given the mandatory sentence of life imprisonment without benefit of parole, probation, or suspension of sentence. The defendant appeals her convictions and her adjudication as a multiple offender. We affirm.
FACTS
The Shreveport Police Department received information that Broome was involved in drug activity. A female confidential informant (“Cl”) was secured who knew Broome personally. A Shreveport police task force, the Cl, and Deputy Jonathan Kennedy, who was an undercover officer from the Caddo Parish Sheriffs Office, embarked upon an investigation. Six hundred hydrocodone pills, also known as Lortab, were checked out of the Shreveport Police Department property room and given to Kennedy who, along with the Cl, sought to trade the hydrocodone pills to Broome in exchange for methamphetamine.
On May 31, 2011, Kennedy and the Cl went to Broome’s residence in Oil City, Louisiana. Kennedy claimed he observed Broome sell methamphetamine to a man named Dennis in her front yard. Then Kennedy sold Broome 15 hydrocodone tablets for $60. Broome gave six of the pills to Dennis and she kept the rest. A search warrant was obtained for Broome’s residence. An arrest team gained entry to the residence and Broome was arrested. However, the hydrocodone pills were not recovered.
12Broome was charged with one count of possession of hydrocodone, one count of distribution of methamphetamine, and one count of distribution of hydrocodone. On April 18, 2012, following a jury trial, the defendant was found guilty of one count of possession and one count of distribution of hydrocodone. She was acquitted on the charge of distribution of methamphetamine. A motion for new trial and a motion to modify and/or amend the sentence were denied by the trial court on April 23, 2012. On January 31, 2013, the defendant was given concurrent sentences of five years at hard labor on the possession con- *983 vietion and 10 years at hard labor on the distribution conviction. She was also ordered to pay a fine of $5,000 on each charge plus court costs.
Broome was charged in an amended habitual offender bill of information with being a fourth felony offender based upon her conviction for distribution of hydroco-done. Broome filed a motion to quash the habitual offender bill of information, claiming that she was not properly informed of her rights when the predicate guilty pleas were entered. At the habitual offender hearing on May 1, 2013, the trial court denied the motion to quash. On May 9, 2013, Broome was adjudicated a fourth felony offender. Her prior sentence of 10 years for distribution was vacated and the mandatory sentence of life in prison without benefit of parole, probation, or suspension of sentence was imposed. Broome appealed.
SUFFICIENCY OF THE EVIDENCE
Broome argues that the evidence presented at trial was insufficient to convict her of one count of possession and one count of distribution of hydrocodone. Broome argues that the prosecution was required to prove that |sshe did, in fact, possess and distribute hydrocodone. According to Broome, because no hydroco-done pills were recovered from her residence, the prosecution failed to provide one scintilla of evidence that she possessed or distributed hydrocodone. Broome contends that all the prosecution proved was that one pill in the batch of 600 checked out of the police property room was identified as hydrocodone by a crime lab analyst based upon the markings on that pill. Broome argues there was no evidence that the sample pill identified at the crime lab was similar to the 15 pills which Kennedy claimed he sold to her, six of which she then distributed to another person. According to Broome, for the prosecution to have established its case at trial by proof beyond a reasonable doubt, it would have had to produce evidence that the sample pill was identical in chemical composition to the pills which Broome is alleged to have possessed and distributed. Broome maintains that the prosecution failed to show whether the sample pill was taken from the same bottle as the pills involved here, whether the 600 pills came from one prior case or multiple cases, whether the pills were all Schedule III hydrocodone as opposed to Schedule II hydrocodone where no other non-narcotic element is present, and whether the chemical composition of the pills was previously tested. These arguments are without merit.
Legal Principles
The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
UThis standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Moore, 44,429 (La.App.2d Cir.8/26/09), 20 So.3d 1137, writ not cons., 2009-2166 (La.4/9/10), 31 So.3d 378; State v. Strother, 43,363 (La.App.2d Cir.8/20/08), 990 So.2d 130, writ denied, 2008-2289 (La.5/15/09), 8 So.3d 580. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442; State v. Moore, supra. A reviewing court accords great deference to a jury’s decision to accept or reject the testi *984 mony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 2009-0725 (La.12/11/09), 23 So.3d 913; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529; State v. Moore, supra.
Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Moore, supra. For a case resting essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; State v. Gipson, 45,121 (La.App.2d Cir.4/14/10), 34 So.3d 1090, writ denied, 2010-1019 (La.11/24/10), 50 So.3d 827.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of ^evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Moore, supra; State v. Barakat, 38,419 (La.App.2d Cir.6/23/04), 877 So.2d 223.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Moore, supra.
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Moore, supra. Such testimony alone is sufficient even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant. State v. Moore, supra.
The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey, 1999-0023 (La.1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000); State v. Moore, supra.
La. R.S. 40:968 provides in pertinent part:
IfiA. Manufacture; distribution. Except as authorized by this part, it shall be unlawful for any person knowingly or intentionally:
(1) To produce, manufacture, distribute or dispense or possess with intent to produce, manufacture, distribute, or dispense, a controlled dangerous substance classified in Schedule III[.]
C. Possession. It is unlawful for any person knowingly or intentionally to possess a controlled dangerous substance classified in Schedule III unless such substance was obtained directly or pursuant to a valid prescription or order from a practitioner, or as provided in R.S. 40:978 or R.S. 40:1239, while acting in the course of his professional practice or except as otherwise authorized by this Part[.]
*985 To support a conviction for possession of a CDS, the prosecution must prove that the defendant knowingly possessed an illegal drug. State v. Murphy, 09-432 (La.App.5th Cir.11/24/09), 28 So.3d 496, writ denied, 2010-0016 (La.6/25/10), 38 So.3d 334. The identity of the drug is an essential element of the charged offense. State in Int. of J.W., 597 So.2d 1056 (La.App. 2d Cir.1992); State v. Murphy, supra; State v. Miller, 587 So.2d 125 (La.App. 2d Cir.1991). Possession of a CDS may be established by showing that the defendant exercised either actual or constructive possession of the substance. “Actual possession” means having an object in one’s possession or on one’s person in such a way as to have direct physical contact with and control of the object. State v. Keys, 29,369 (La.App.2d Cir.5/7/97), 694 So.2d 1107, writs denied, 1997-1387, 1997-1497 (La.10/31/97), 703 So.2d 21.
To present sufficient evidence of distribution of a CDS, the state must prove the following elements: (1) delivery or physical transfer of the CDS to its intended recipient; (2) guilty knowledge of the CDS at the time of the 17transfer; and (3) the exact identity of the CDS. State v. Ashley, 44,861 (La.App.2d Cir.10/28/09), 26 So.3d 193; State v. Moore, supra.
In State v. Smith, 2012-2358 (La.12/10/13), 130 So.3d 874, the supreme court stated:
Substantial jurisprudence exists, in fact, for the proposition that a contraband drug may be identified by circumstantial evidence as well as direct testimony with respect to scientific tests conducted on the substance. See, e.g., United States v. Eakes, 783 F.2d 499, 505 (5th Cir. 1986) (Such circumstantial proof may include ‘““evidence of the physical appearance of the substance involved in the transaction, evidence that the substance produced the expected effects when sampled by someone familiar with the illicit drug, evidence that the substance was used in the same manner as the illicit drug, testimony that a high price was paid in cash for the substance, evidence that transactions involving the substance were carried on with secrecy or deviousness, and evidence that the substance was called by the name of the illegal narcotic by the defendant or others in his presence.” ’ ”) (quoting United States v. Scott, 725 F.2d 43, 45-46 (4th Cir.1984) (quoting United States v. Dolan, 544 F.2d 1219, 1221 (4th Cir.976))); State v. Harris, 02-1589, p. 6 (La.5/20/03), 846 So.2d 709, 713-14 (“The federal courts subscribe generally to the view that the ‘government need not introduce scientific evidence to prove the identity of a substance ... as long as there is sufficient lay testimony or circumstantial evidence from which a jury could find that a substance was identified beyond a reasonable doubt, the lack of scientific evidence does not warrant reversal.’ Identification of a controlled substance does not require direct evidence if available circumstantial evidence established its identity beyond a reasonable doubt.... Identification based upon familiarity through law enforcement coupled with present observation of the substance at hand will suffice to establish the illicit nature of a suspected substance.”) (quoting United States v. Harrell, 737 F.2d 971, 978 (11th Cir.1984) (other citations omitted)); State v. Chatman, 599 So.2d 335, 347 (La.App. 1 Cir.1992) (“As long as there is sufficient lay testimony or circumstantial evidence from which a jury could find beyond a reasonable doubt that a substance was identified beyond a reasonable doubt, the lack of scientific evidence does not warrant reversal.”) (citing United States v. Sanchez DeFun *986 dora, 893 F.2d 1173, 1175 (10th Cir.1990)).
|sSee also State v. Harris, supra; State v. Murphy, supra. Identification of pills by a forensic chemist through visual inspection has been held to be sufficient. See State v. Murphy, supra; State v. Carter, 2007-1237 (La.App.3d Cir.4/9/08), 981 So.2d 734, writ denied, 2008-1083 (La.1/9/09), 998 So.2d 712.
Discussion
In examining the sufficiency of the evidence in this matter, a thorough review of the facts is necessary. Agent Keith Knox of the Shreveport Police Department Narcotics Unit testified that he had information that Broome was involved in drug activity. He was the case agent for the operation conducted on May 31, 2011, in which Kennedy and a Cl would give Broome hydrocodone in exchange for methamphetamine.
A cover team, which also served as the arrest team, was staged at an area out of sight, but close to Broome’s home. Agent Knox stayed behind with a judge to secure a search warrant. He was in contact with the arrest team and secured the warrant as soon as probable cause was established. He then traveled to Broome’s residence, which took 50 minutes. When he arrived, he observed that several people on the scene were handcuffed, including Broome.
Corporal Steve McKenna of the Shreveport Police Department checked 600 hy-drocodone pills out of the Shreveport Police Department property room and gave them to Kennedy. Kennedy accompanied a Cl who knew Broome to a meeting at Broome’s house in order to exchange hy-drocodone for methamphetamine. The residence was a single-wide trailer set off the road. A white male and a black male exited the residence. The Cl | ¡¿dentified the white male as Broome’s son, Michael. Michael asked the Cl if Broome knew they were coming to the residence. The Cl said they were expected. Michael called Broome on a cell phone. The Cl spoke with Broome, who said she was at a ball game in Vivian, but would be returning to the residence. After the phone call was concluded, the Cl entered Broome’s residence and Kennedy followed. The Cl introduced Kennedy to Jeffrey Lunsford, who was smoking marijuana in one of the bedrooms. Kennedy suggested to the Cl that they await Broome’s return outside. They exited the trailer and waited in the yard. Michael returned and soon Jeffrey, another of Broome’s sons, arrived. Jeffrey got out of his car and handed the Cl his cell phone and said, “It’s momma.” The Cl claimed that Broome told her she was on her way to the residence and would pick up some methamphetamine on the way. Kennedy said they had waited about 45 minutes when a man named Dennis drove up in a white pickup truck. Dennis gave the Cl his cell phone and told her, “It’s Wanda.” The Cl said Broome told her she was about five minutes away.
Broome arrived in a blue pickup truck with a male passenger. According to Kennedy, Dennis had some money rolled up and approached Broome, who handed him a plastic bag containing translucent glass shards which appeared to be crystal methamphetamine in exchange for the money.
Broome said they should all go inside “to take care of the other business.” Kennedy got the hydrocodone pills from the Cl’s car and entered the trailer with the group. Kennedy was the last person in and Jeffrey locked the door behind him. Broome had everyone come to her bedroom. She told Kennedy she was not comfortable with him because they had never met. linKennedy lifted his shirt to demonstrate he was not wearing an audio recording device. Broome asked Kennedy if he *987 had the Lortab. She counted out $60, laid it on the bed, and asked for 15 of the pills. Kennedy counted out the hydrocodone tablets and handed them to the Cl, who passed them to Broome. Broome gave six of the pills to Dennis and said she was keeping the rest as a surcharge. According to Kennedy, Broome put her nine hy-drocodone pills on her night stand.
Broome said she was ready to move to “the next thing.” She then told Kennedy to get out of the house. Kennedy left the trailer and concluded that he would not have the opportunity to buy any methamphetamine. He signaled the arrest team to move in. Dennis left in his truck before the arrest team arrived.
McKenna, who was in charge of the arrest team, took over and Kennedy left the scene. According to McKenna, the arrest team was informed that Knox had secured a search warrant and they began attempting to enter the trailer at 9:50 p.m. They used a battering ram on the door, which was not entirely effective because the door opened out and not in. One member of the arrest team failed to bring the “go bar” used for opening this type of door. According to McKenna, entry is usually gained in two or three seconds. It took 15-20 seconds to enter Broome’s residence. Such a delay caused a loss of speed, shock and surprise. The officers battered a hole in the center of the door and then reached in and unlocked it.
According to McKenna, when the arrest team entered the trailer, Broome was at the entrance to the hallway. Some marijuana was found in one of the rooms of the trailer, but the hydrocodone pills were never | ^recovered. McKenna testified that there are several ways to destroy drug evidence including flushing, hiding, or ingesting it. Materials used to package drugs, along with digital scales and a police scanner, were recovered from the trailer. Broome was arrested. McKenna took the remaining 585 hydrocodone pills back to the Shreveport Police Department property room and checked them in. One of the pills was sent to the crime lab for identification.
At trial, a certified report from the North Louisiana Criminalistics Laboratory was introduced into evidence without objection. According to the report, one blue caplet marked “WATSON 540” was “determined to contain a visually characterized pharmaceutical preparation containing hydrocodone in combination with a nonnarcotic ingredient, Schedule III.”
Broome testified at trial. She stated that she had known the.Cl since the girl was a baby. Broome claimed that the Cl began calling her at work and she did not recognize the name on the messages and she did not return the calls. Three days before this incident, Broome claimed that the Cl came to her house and told her that she had cancer. According to Broome, the Cl claimed her pain medication made her sick and she asked Broome if she knew anyone who might get rid of it. Broome claimed she told the Cl, “I do not mess around like that no more.” Several nights later, Broome was at a t-ball game in which one of her grandchildren was a participant. One of Broome’s children called and told her that the Cl was at her house. Broome said she picked up a man who was going to work on her truck and 90 minutes later she arrived at her house. The Cl and a man were standing in the yard. Broome said they all went into her bedroom and the man with the |12CI sold “Lortabs” to “this other guy that was there.” Broome claimed at that point she asked the Cl to leave. The Cl and the man with her left. The task force arrived and rammed the door to the residence. When they got inside, Broome was arrested. Broome claimed she asked McKenna *988 why she was being arrested. He told her the arrest was because she was selling Lortab. She denied the accusation.
Broome admitted her prior criminal history which included a 1991 conviction for distribution of Schedule II CDS, methamphetamine, a 1998 conviction of possession of methamphetamine, and a 2000 conviction for distribution of methamphetamine. After the 2000 conviction, her probation was revoked and she served six years in prison.
Broome testified that no Lortab was recovered from her house. Regarding the drug packaging material and digital scales found in her house, Broome said those items had been in a storage building and she had brought them inside. She acknowledged having a police scanner in the house as well.
Broome insisted that all the law enforcement officers who testified at trial were lying. She asserted that she used to date a friend of McKenna’s and because of that, McKenna had a vendetta against her. Broome claimed that Jeffrey Lunsford, the man Kennedy observed smoking marijuana in her house, was the father of one of her children. She contended that she did not know that Lunsford smoked marijuana in her residence.
McKenna stated that he had previously arrested Broome and that at some point, she dated someone he knew in high school. McKenna denied having a vendetta against Broome.
|13In this case, the jury heard testimony that 600 hydrocodone pills, also known as Lortab, were checked out of the police property room. A forensic chemist identified one of these pills as hydrocodone. Kennedy testified that he, the Cl, Dennis (to whom Broome had just sold methamphetamine), and another man all went into Broome’s bedroom to conduct business. Broome’s son locked the door of the residence behind the group. Kennedy stated that he sold 15 of the pills to Broome. He then observed her give six of the pills to Dennis.
The actual pills sold to Broome could not be tested because they were not recovered. The evidence established that Broome had sufficient time to dispose of the drugs while the arrest team was struggling to gain entry to the residence. In her trial testimony, Broome confirmed that a drug deal involving Lortab occurred in her bedroom. She specifically referred to the pills she saw as Lortab. Broome simply denied her involvement in the transaction, asserting that Kennedy sold the pills to “this other guy that was there.”
The jury made a credibility call and chose to believe Kennedy’s testimony and not Broome’s. The physical appearance of the pills, the high price paid for them, the transaction carried out in Broome’s bedroom behind a locked door to the residence, the reference to the drug as Lortab by all involved, including Broome, and Kennedy’s testimony that he sold the drugs to Broome, who took possession of them and gave some of them to Dennis, constituted sufficient proof beyond a reasonable doubt of the essential elements of both possession and distribution of hydro-codone and was sufficient to convict Broome of those charges.
_|_yJUDGE’S COMMENT ON ENTRAPMENT
Broome argues that the trial court erred in admonishing the jury, following the opening statement of counsel for the defendant, that there was “no entrapment defense in this case” and further admonishing the jury not to consider entrapment as a defense in this case. This argument is without merit.
*989 Legal Principles
La. C. Cr. P. art. 772 provides:
The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted.
Essential to the concept of a fair trial is the requirement of complete neutrality on the part of the presiding judge. State ex rel Whiticar v. Butler, 576 So.2d 515 (La.1991). The no-judge-comment rule is designed to safeguard the role of the jury as the sole judge of the facts on the issue of guilt or innocence. If the effect of a question or comment is to permit a reasonable inference that it expresses or implies the judge’s opinion as to the defendant’s innocence or guilt, this constitutes a violation of the defendant’s statutory right to no-comment and thus requires reversal. To constitute reversible error, however, the effect of the improper comment must be such as to have influenced the jury and contributed to the verdict. State v. Patterson, 2011-892 (La.App.3d Cir.2/1/12), 83 So.3d 1209, writ denied, 2012-0526 (La.6/1/12), 90 So.3d 435; State v. Walker, 97-1180 (La.App.3d Cir.3/6/98), 710 So.2d 304; State v. Colligan, 95-880 (La.App.3d Cirj8/7/96),15 679 So.2d 184. Likewise, any comment or question by the judge expressing or implying his opinion with regard to a material issue is reversible. State v. Thomas, 2012-1458 (La.App.3d Cir.6/5/13), 114 So.3d 684.
A trial judge’s remarks made while giving reasons for a ruling are not objectionable as comments on the case unless they are unfair or prejudicial to the accused. State v. Motion, 395 So.2d 1337 (La.1981), cert. denied, 454 U.S. 850, 102 S.Ct. 289, 70 L.Ed.2d 139 (1981); State v. Guillot, 353 So.2d 1005 (La.1977), writ denied, 367 So.2d 864 (La.1979); State v. Warner, 93-0216 (La.App.4th Cir.7/27/94), 641 So.2d 684, writ denied, 94-2517 (La.1/27/95), 649 So.2d 379. When the trial judge’s comments do not imply an opinion as to the defendant’s guilt or innocence, any error in making the comment is harmless. State v. Egana, 550 So.2d 1243 (La.App. 4th Cir.1989); State v. Cathey, 493 So.2d 842 (La.App. 5th Cir.1986), writ denied, 500 So.2d 419 (La.1987), cert. denied, 481 U.S. 1049, 107 S.Ct. 2181, 95 L.Ed.2d 838 (1987).
Trial counsel’s failure to object to the trial judge’s remark and/or seek a mistrial precludes appellate review of the assignment of error. La. C. Cr. P. art. 841; State v. Warner, supra; State v. Cathey, supra. However, if the comments are so extremely inflammatory and prejudicial that they violate due process, the issue may be considered without a contemporaneous objection. See State v. Colligan, supra; State v. Rochon, 98-717 (La.App.5th Cir.3/10/99), 733 So.2d 624; State v. Walker, supra.
Discussion
|1fiIn his opening statement, Broome’s counsel at trial stated:
Got a lot of problems with this case from day one. They’re trying to make a case on speculation. They’re trying to make it on entrapment. And they are trying to produce evidence that they did not recover from the client.
After defense counsel concluded his opening statement, the prosecution asked to approach the bench and an unrecorded bench conference was held between both counsel and the judge. The trial court then made the following statement:
Ladies and gentlemen, this is — like I said, this is argument in what the attorneys believe the case will show. [De *990 fense counsel] did bring up entrapment. There is no entrapment in this case. There is no entrapment defense in this case. So you are not to consider that in this case, okay?
Defense counsel made no objection to the statement by the trial court. Therefore, arguably this issue is not reviewable on appeal. However, we have examined the argument and conclude that the trial court’s comments did not violate La. C. Cr. P. art.- 772. The trial court did not comment on the facts of the case and did not express or imply an opinion as to the defendant’s guilt or innocence. Further, there is no showing that the comment influenced the jury or contributed to the verdict. As stated above, defense counsel did not object to the comment and did not argue that he was precluded from raising entrapment as a defense.[1] We note that entrapment 117was never brought up during voir dire. The defendant did not claim any entrapment in her testimony. Indeed, her defense was that Kennedy sold the Lortab to someone other than her, the law enforcement officials were lying, and no drugs were found. No jury instruction on entrapment was requested. Entrapment was simply not an issue in this case. Accordingly, the trial court’s comments did not constitute error.
HABITUAL OFFENDER FINGERPRINT EVIDENCE
In her third assignment of error, Broome argues that the state failed to prove her prior convictions beyond a reasonable doubt at the habitual offender hearing because it relied solely on fingerprint evidence. She suggests that since all of the convictions arose in the First Judicial District Court, the state could have produced witnesses such as arresting officers, booking officers, and parole and probation officers to prove her identity as the person convicted in the predicate offenses. This argument is without merit.
Legal Principles
To prove that a defendant is a habitual offender, the state is required to establish, by competent evidence, that there is a prior felony conviction and that the defendant is the same person who was convicted of that prior felony. State v. Payton, 2000-2899 (La.3/15/02), 810 So.2d 1127; State v. Smith, 46,343 (La.App.2d Cir.6/22/11), 71 So.3d 485, writ denied, 2011-1646 (La.1/13/12), 77 So.3d 950. Both the identity and the prior conviction alleged must be proven beyond a reasonable doubt. La. R.S. 15:529.1(D)(l)(b); State v. Brown, 2011-1656 (La.2/10/12), 82 So.3d 1232. Various methods of proof establishing identity have been recognized as sufficient to sustain the state’s burden of proof including testimony of witnesses, expert opinion as to fingerprints, and photographs contained in duly authenticated records. State v. Brown, supra; State v. Henry, 42,416 (La.App.2d Cir.9/19/07), 966 So.2d 692, writ denied, 2007-2227 (La.8/29/08), 989 So.2d 95.
*991 Discussion
The state asserted that Broome had the following predicate convictions: distribution of Schedule II CDS, 1991; possession of Schedule II CDS, 1998; and distribution of Schedule II CDS, 2000. At the habitual offender hearing on May 1, 2013, the state elected to prove Broome’s identity by having her fingerprinted by an expert who then compared those prints to the ones from her prior convictions. Lt. Owen McDonnell of the Caddo Parish Sheriffs Office was accepted as an expert in fingerprint and friction skin analysis. Lt. McDonnell took Broome’s fingerprint impressions and compared them to those found on certified documents of her previous convictions. He concluded that the fingerprint impressions were all from the same person.
On cross-examination, Lt. McDonnell stated that in comparing the current prints and those from the 2000 conviction, he found in excess of 29 major ridge events in commonality with no unexplainable differences. As to the fingerprints from the 1998 conviction, he saw in excess of 27 major ridge events with no unexplainable differences. As to the fingerprint evidence from the 1991 convictions, Lt. McDonnell noted that it was of lower quality and clarity in comparison to the more recent ones. | ^Nonetheless, he was still able to observe 10 major ridge events in commonality with no unexplainable differences for the middle finger impressions and 14 for the little finger impressions. According to Lt. McDonnell, these were more than adequate to form an opinion as to whether the prints came from the same person and that as few as six points had been used in court before. While he found more clarity in the fingerprint evidence for the 2000 and 1998 convictions, he opined that the evidence of the 1991 conviction was reliable.
The evidence presented by the state was sufficient to prove beyond a reasonable doubt that Broome was the same person who was convicted of each of the three predicate felony convictions.[2] Accordingly, we find that this assignment of error lacks merit.
CONCLUSION
The defendant’s convictions and sentences are affirmed.
AFFIRMED.

. Entrapment is an affirmative defense. The burden is on the defendant to prove entrapment by a preponderance of the evidence. The question whether the government agent implanted the criminal idea in the mind of an innocent person to induce the commission of a crime that would not otherwise be committed is one for the jury. State v. Brand, 520 So.2d 114 (La.1988). The entrapment defense will not be recognized when the law enforcement official merely furnishes the accused with an opportunity to commit a crime to which he is predisposed. In entrapment cases, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal. Thus, the focus in determining an entrapment defense is on the conduct and disposition of the defendant, as well as the conduct of the government agent. State v. Brand, supra.

. As previously mentioned, Broome admitted to each of these convictions during cross-examination when she testified during her jury trial.