Judgment rendered December 14, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 54,888-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

MATTHEW J. PARKS                            Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 376,352

Honorable Donald E. Hathaway, Jr., Judge

* * * * *

LOUISIANA APPELLATE PROJECT            Counsel for Appellant
By: Peggy Sullivan

JAMES E. STEWART, SR.                  Counsel for Appellee
District Attorney

TOMMY JAN JOHNSON
JASON WAYNE WALTMAN
VICTORIA T. WASHINGTON
Assistant District Attorneys

* * * * *

Before MOORE, COX, and HUNTER, JJ.

**COX, J.**

This criminal appeal arises from the First Judicial District Court, Caddo Parish, Louisiana. Following a jury trial, defendant, Matthew Parks ("Parks"), was convicted of one count of vehicular homicide in violation of La. R.S. 14:32.1. Parks was fined $2,000 and sentenced to 25 years at hard labor, with five years to be served without benefit of probation, parole, or suspension of sentence. Parks now appeals, challenging the sufficiency of the evidence for his conviction and the excessiveness of his sentence. For the following reasons, we affirm Parks' conviction but remand for resentencing.

## STATEMENT OF FACTS

On June 11, 2020, Shreveport Police Department ("SPD") responded to an automobile accident that occurred at the intersection of Highway 3132 and Linwood Avenue in Shreveport, Louisiana. Evidence introduced at trial established that the victim, Barbara Moore ("Moore"), operated a red, 1999 Grand Marquis, and Parks was alleged to have driven a silver, 2003 GMC Yukon ("SUV"), which collided into the front left side of Moore's vehicle, trapping her inside, and ultimately caused Moore's death. Upon arrival at the scene, first responders reported seeing a man on the roadway and Moore inside the vehicle. Responding officer Darrell Favis ("Officer Favis")[1] requested a DWI unit, and Parks was taken into custody and subsequently arrested for Moore's death.

---

[1] Prior to its opening statement, the State provided that Officer Favis, the initial responding officer, although subpoenaed to testify at trial, was unable to testify because he was involved in an automobile accident the morning of trial and would be unable to testify for any portion of the trial. The State and counsel for Parks agreed to continue trial without Officer Favis' testimony.

On July 6, 2020, the State of Louisiana filed a bill of information charging Parks with vehicular homicide.[2] On July 13, 2021, a two-day jury trial commenced, wherein the following testimony was adduced at trial:

**Corporal Grigsby**

First, the State called Corporal Clinton Grigsby ("Cpl. Grigsby"), of the DWI unit for SPD. Cpl. Grigsby testified that on the day in question, Officer Favis contacted him and requested a DWI unit because there had been a major accident and he suspected that one driver was under the influence. Cpl. Grigsby stated that when he arrived at the scene of the accident, emergency medical services ("EMS") and other police units were present. He stated that he spoke to Officer Favis, who identified Parks as the driver suspected of being under the influence, he detained Parks, and transported him to SPD's selective unit downtown.

He explained that once he arrived at the selective unit, he read Parks his chemical rights for intoxication, but was unable to administer either the walk-and-turn or one-leg-stand sobriety test because Parks claimed that his face, chin, and thigh were injured from the accident. Cpl. Grigsby stated that as a result, he had to administer an Intoxilyzer,[3] which reflected that Parks' BAC was .142 grams percent. Cpl. Grigsby noted that he also suspected Parks was under the influence because he had a strong odor of alcohol, slurred speech, and glossy eyes. After the State introduced and

---

[2] The bill of information initially provided that Park's blood alcohol concentration ("BAC") was .10%, in violation of La. R.S. 14:32.1, but was later amended to reflect a BAC of .08%.

[3] Cpl. Grigsby explained that in operating the Intoxilyzer, he was required to enter Parks' driver's license number.

played a video of Cpl. Grigsby administering the Intoxilyzer, Cpl. Grigsby identified Parks in open court as the person in the video.

On cross-examination, Cpl. Grigsby testified that while there were civilians present when he arrived at the accident, he did not take a statement from them, and no civilian informed him that Parks was the driver of the SUV. He clarified that Officer Favis, the initial responding officer to the accident, informed him that Parks was the driver.[4] In reviewing the video of Parks' sobriety test, Cpl. Grigsby testified that Parks had a napkin with blood on it against his face because he had been injured from the accident. Finally, in reviewing his accident report, Cpl. Grigsby noted that while detained, Parks stated that when he "woke up, [sic] he was on the passenger side and a civilian had pulled him from the vehicle." Cpl. Grigsby then stated that, while not detailed in his report, Parks also stated that he was "thrown in that vehicle when the accident occurred."

**Captain Allen**

Next, Captain Jefferey Mark Allen ("Cpt. Allen") of the Shreveport Fire Department ("SFD") testified. Cpt. Allen stated that as a member of his station's rescue response vehicle, he was responsible for "all hazardous materials, incidents and all technical rescue to include road, confined space and trans vehicle extrication, [and] structural collapse"; or simply, cutting and removing individuals from vehicles. Cpt. Allen testified that he arrived at the accident around midnight or one in the morning. He stated that when

---

[4] On redirect, Cpl. Grigsby clarified that his only role while at the scene of the accident was to render DWI services because "one of the drivers was showing impairment."

3

he exited his truck, he saw a man in the roadway yelling and inconsolable, and observed another person, later identified as Moore, in another vehicle.

Cpt. Allen explained that he and some of his team attempted to examine the man, but turned their attention to Moore after the man refused medical treatment. In describing how he attended to Moore and the extent of damage from the accident, Cpt. Allen stated that when he first examined Moore, she was breathless and did not have a pulse. He explained that normally when a patient is pulseless and unresponsive, he would perform CPR, but in this case, he was unable to because Moore was trapped inside her vehicle. He testified that he had to administer another test on Moore, but after no electrical activity was detected in Moore's heart, he declared her deceased. Cpt. Allen explained that Moore's vehicle was hit from the front left side and that the vehicle was hit hard enough that the "body of the car was detached from the frame." He stated that because of the way Moore was trapped within the vehicle, namely that her feet were tangled within the brake and gas pedal, he had to wait on another SFD truck with the proper equipment to cut Moore away from the vehicle.

On cross-examination, Cpt. Allen provided further information regarding the man he first encountered. He stated that after he finished tending to Moore, he went back to check on the man and was informed that SPD took the man in for questioning. Cpt. Allen clarified that although the man he initially saw at the scene of the accident was described as a patient in his report, he did not deem him to be a patient because the man indicated that he was okay and did not need help. Cpt. Allen stated that he did not recall whether the man had any injuries, but specified on redirect that once the man indicated he was okay, his focus was on Moore. In asking to

4

identify whether he knew who Parks was, Cpt. Allen stated that he did not, but that he assumed Parks was the driver of the SUV but was not certain.

**Corporal Dixon**

Next, Corporal Matthew Dixon ("Cpl. Dixon") testified that as a crime scene investigator for SPD, his general duty is to identify victims and other persons and collect evidence that is deemed to have any evidentiary value either through photography or inked impressions.[5] Cpl. Dixon stated that on the night of the accident, he was called to identify the deceased driver, which he accomplished by taking her prints and comparing them to the tentative ID he received. On cross-examination, Cpl. Dixon clarified that he was called to the scene of the accident solely for the purpose of identifying the victim and that he did not collect DNA or fingerprints from any other person or any surface from the SUV.

**Long Jin, M.D.**

Next, Dr. Long Jin ("Dr. Jin"), who performed Moore's autopsy, was tendered as an expert in clinical, anatomical, and forensic pathology. Dr. Jin testified that he conducted an external exam of Moore's body, but he did not have to collect sample slides because her injuries were "obviously the cause of her death," as she suffered multiple blunt force injuries as a result of the accident. Dr. Jin then listed several of Moore's injuries, including, but not limited to the following: compound fracture of both ankles, closed fracture of the right distal radius, chest wall contusion and bruising, rib fractures, and a split aorta, which resulted in "catastrophic bleeding."

---

[5] Cpl. Dixon explained that inked impressions replicate an exact impression of a person's finger, which is then used to obtain a person's name, SID number, or state identification number. This information is run through the statewide Automated Fingerprint Identification System, which contains fingerprints for anyone that has a government job, such as city or state employer, or any person with a criminal record.

**Corporal Lane**

Next, Corporal Tasha Lane ("Cpl. Lane"), a crash investigator from SPD, testified. Cpl. Lane explained that when called to an accident, she marks the scene by photographing the area, and if needed, will speak with anyone at the scene as a "follow-up." In describing the accident, Cpl. Lane stated that the collision occurred at the intersection of Linwood and Highway 3132, which had a speed limit of 45 miles per hour ("mph"), and that the accident spanned a large area with "one vehicle that was turned the opposite way, facing the opposite way towards the interstate, and another one farther down that was partially on the roadway."

Cpl. Lane stated that when she arrived at the accident at 1:39 a.m., she spoke with the supervising officer, Matt Reardon, and Officer Favis. The State then introduced, and Cpl. Lane reviewed, several photographs she took of the accident. In her review, Cpl. Lane noted that the only airbag deployed from the SUV was the driver's and the SUV sustained damage primarily to the front driver's side. She further testified that Parks was determined to be the driver of the SUV and that investigators did not locate any passengers from the SUV. She stated that she did not speak with any civilians who claimed to be the driver of the SUV or any first responders who reported seeing anyone drive the SUV. Cpl. Lane also noted that, other than Parks and Moore, no other individual indicated that they had been injured from the accident.

Cpl. Lane then testified that, as part of her investigation, she applied for a search warrant for the SUV's airbag control module ("ACM") and she and Sergeant Duane Farquhar ("Sgt. Farquhar") recovered the information from it. She explained that information concerning a vehicle's seat belts,

number of passengers, speed, and braking is downloaded and stored in the ACM. On cross-examination, Cpl. Lane reviewed the photographs of the accident again and clarified that the photographs were of the scene when she arrived. She reiterated that she spoke to Officer Favis and that she did not speak with anyone who identified themselves as the driver of the SUV.[6] Finally, Cpl. Lane explained that the SUV's ACM revealed that the only occupant in the vehicle at the time of the accident was the driver and that the driver's seat belt was unbuckled.

**Sergeant Farquhar**

Sgt. Farquhar, the State's last witness and supervisor of the crash investigations unit for SPD, testified. Sgt. Farquhar testified that he collected and interpreted the crash data report generated from the SUV's ACM. He explained that the ACM records crash data and airbag deployment data, which is then retrieved through Bosch Crash Data Retrieval software or through a vehicle's OB2D port. Sgt. Farquhar stated that due to the extensive damage from the SUV, he had to physically remove the ACM to generate a crash report. He stated that because the SUV was an older model vehicle, the ACM yielded only basic data including, "velocity or speed in miles an hour, engine RPMs, throttle percentages, braking circuit status, whether or the brakes were engaged or not, which airbags were deployed, and whether or not the seat belt restraint system, the active restraint system was engaged or not."

---

[6] Cpl. Lane also reviewed video surveillance from an officer's vehicle and stated that while there were some civilian vehicles present at the scene of the accident, she was unsure whether any other officers spoke with any bystanders or if officers attempted to contact Kenneth Wilson, the owner of the SUV.

Regarding the SUV's airbag system, Sgt. Farquhar explained that the system is passive such that it is only activated or will "wake up" when it detects a change in velocity or negative accelerations; as such, the system will monitor activity but will not deploy the airbags until needed. He stated that the SUV's supplemental inflatable restraint system warning lamp status, which indicates whether a vehicle's airbag system is deactivated, was not on, which meant that the system was "factory set and [sic] ready to work." He explained that the SUV's passenger airbag, which is the only airbag that can be suppressed, did not deploy because the module did not register a passenger weight above 65 pounds,[7] indicating that the seat was vacant from anyone over 65 pounds. Sgt. Farquhar then stated that five seconds before the airbags deployed, the vehicle traveled at 57 mph and increased to 67 mph one second before deployment.

On cross-examination, Sgt. Farquhar clarified that the airbags were in proper condition at the time of the accident. He stated that, in general, airbags are federally regulated and that he had never known airbags not to deploy. He explained that airbags operate according to a sensing module that determines which airbags to deploy based on a change in velocity. He stated that if a passenger is detected, the airbags will deploy, especially if the vehicle is hit in the front. Sgt. Farquhar testified that while a passenger airbag can be turned off, he was unsure whether this particular SUV had the capability to do so.

---

[7] Sgt. Farquhar explained that airbag deployment is a two-stage system based on the weight of its passengers. He stated that the first-stage deployment is "a 75-mile-an-hour deployment if it detects a small statured person or their weight." Further, the second-stage deployment, which is the main system, is a "150-miles-per-hour deployment."

**Daylan Roberson**

Finally, Daylan Roberson ("Roberson") testified in Parks' defense. Roberson stated that on the night in question, Parks called him and the pair made plans to meet at Roberson's house before visiting with a group of people. Roberson alleged that Parks rode with an unnamed man to Roberson's house because Parks had been drinking. Roberson stated that his brother, Cameron Roberson ("Cameron"), drove his car, a white Mercedes, and they followed behind Parks and the unnamed man. Roberson explained that as they traveled down Linwood, he was looking down at his phone when he heard a "loud boom." He stated that when he looked up, he saw that Parks and the unnamed man had gotten into an accident.

Roberson testified that Cameron immediately pulled the car over and the pair went to help Parks when they noticed that the unnamed man exited the SUV but noticed that Parks didn't move. Roberson stated he and Cameron removed Parks from the SUV by reaching through the passenger window to unbuckle Parks' seat belt before they pulled him out. He testified that after he made sure Parks was okay, he, Cameron, and Parks went to check on the driver of the other vehicle. Roberson stated that when they realized the driver did not survive the accident, he called his parents, and Cameron called 911. Roberson stated that first responders arrived shortly after his parents arrived and he was questioned separately from everyone else. He explained that because he was asked to leave, he was unaware that Parks had been arrested until hours later.

On cross-examination, Roberson admitted that after he learned that Parks was arrested for Moore's death, he did not speak with officers for several months, and only clarified the details of the accident to Parks'

attorney sometime after. Roberson then provided that he saw the unnamed man drive the SUV and that while he did not know who the man was, he described him as being short and having dark skin. Roberson stated that he saw this unnamed man exit the SUV shortly after the accident occurred, but could not recall whether the man left the scene, and had no knowledge of where the man went.

At the close of testimony, the jury unanimously found Parks guilty as charged. On August 18, 2021, Parks appeared for sentencing, wherein the judge denied Parks' motion for new trial. Thereafter, the judge briefly reviewed Parks' criminal history, reflecting that Parks was previously convicted of operating a motor vehicle while intoxicated in February 2020. After the trial court reviewed the facts of this case and noted the victim impact statements, it sentenced Parks to 25 years at hard labor, and in accordance with La. R.S. 14:32.1(B), provided that the first five years were to be served without benefit of probation, parole, or suspension of sentence; additionally, the court imposed a $2,000 fine. This appeal followed.

## DISCUSSION

*Sufficiency of the Evidence*

In his first assignment of error, Parks contends that the evidence presented at trial was insufficient to support his conviction. Specifically, Parks argues that the State failed to prove beyond a reasonable doubt that he was the individual who drove the SUV, in part, because none of the State's witnesses testified to actually having seen Parks drive the SUV or that they spoke to any bystanders at the time of the accident who confirmed that Parks drove the SUV. In contrast, he argues that Roberson, who was present at the time of the accident, testified that Parks had been a passenger in the SUV

10

and that his testimony confirmed that Parks was not the driver. He further argues that the State failed to consider that the information collected from the vehicle's ACM could be false. Specifically, he argues that there are instances in which airbags have failed to deploy, do not always function properly, or may be disabled, which could have occurred in this case. We disagree.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Steines*, 51,698 (La. App. 2 Cir. 11/15/17), 245 So. 3d 224, *writ denied*, 17-2174 (La. 10/8/18), 253 So. 3d 797. This standard, now codified in La. C. Cr. P. art. 821, does not afford appellate courts with a means to substitute its own appreciation of the evidence for that of the fact finder. *Steines*, *supra*.

The *Jackson* standard is applicable to cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. *State v. Sutton*, 436 So. 2d 471 (La. 1983).

11

Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Broome*, 49,004 (La. App. 2 Cir. 4/9/14), 136 So. 3d 979, *writ denied*, 14-0990 (La. 1/16/15), 157 So. 3d 1127. If a case rests essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; *Broome, supra*; *State v. Gipson*, 45,121 (La. App. 2 Cir. 4/14/10), 34 So. 3d 1090, *writ denied*, 10-1019 (La. 11/24/10), 50 So. 3d 827.

Appellate courts neither assess the credibility of witnesses nor reweigh evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. Rather, the reviewing court affords great deference to the jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Gilliam*, 36,118 (La. App. 2 Cir. 8/30/03), 827 So. 2d 508, *writ denied*, 02-3090 (La. 11/14/03), 858 So. 2d 422. Where there is conflicting testimony concerning factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Allen*, 36, 180 (La. App. 2 Cir. 9/18/02), 828 So. 2d 622, *writ denied*, 02-2595 (La. 6/27/03), 847 So. 2d 1255.

In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Elkins*, 48,972 (La. App. 2 Cir. 4/9/14), 138 So. 3d 769, *writ denied*, 14-0992 (La. 12/8/14), 152 So. 3d 438; *State v. Wiltcher*, 41,981 (La. App. 2 Cir. 05/09/07), 956 So. 2d 769. When a defendant challenges both the sufficiency of the evidence, and other trial errors, the reviewing court first reviews sufficiency, as a

failure to satisfy the sufficiency standard will moot trial errors. *State v. McGee*, 51,977 (La. App. 2 Cir. 4/3/19), 316 So. 3d 1196.

Moreover, in a case where a defendant claims he was not the person who committed the offense, the *Jackson* standard requires that the prosecution negate any reasonable probability of misidentification. *State v. Green*, 38, 335 (La. App. 2 Cir. 5/12/04), 873 So. 2d 889, *writ denied*, 04-1795 (La. 11/24/04), 888 So. 2d 227; *State v. Powell*, 27,959 (La. App. 2 Cir. 4/12/96), 677 So. 2d 1008, *writ denied*, 96-1807 (La. 2/21/97), 688 So. 2d 520

Here, Parks was charged with vehicular homicide, in violation of La. 14:32.1 which is defined, in pertinent part as:

> . . . the killing of a human being caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle, aircraft, watercraft, or other means of conveyance, whether or not the offender had the intent to cause death or great bodily harm, whenever any of the following conditions exist and such condition was a contributing factor to the killing:
>
> (1) The operator is under the influence of alcoholic beverages as determined by chemical tests administered under the provisions of R.S. 32:662.
>
> (2) The operator's blood alcohol concentration is 0.08 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of blood.

Accordingly, to "convict a defendant under the vehicular homicide statute, the State must prove that the offender's unlawful blood alcohol concentration, combined with his operation of a vehicle, caused the death of a human being." *State v. Magrini*, 19-0951 (La. App. 4 Cir. 5/27/20), 301 So. 3d 525. In this case, Parks does not dispute that he drank alcohol prior to the accident, as the record reflects that his BAC was .142 grams percent; rather, he contends that the State failed to prove that he drove the SUV.

13

At the outset, we note that while none of the State's witnesses actually saw Parks drive or exit the driver's side of the SUV, as they arrived sometime after the accident occurred, their collective testimony, coupled with the evidence from the ACM, was nevertheless sufficient for a rational trier of fact to conclude that Parks drove the SUV. In particular, Cpl. Grigsby testified that the responding officer requested a DWI unit because one of the drivers involved in the accident showed signs of impairment. He stated that when he arrived, the responding officer identified Parks as the driver suspected of being under the influence, and noted that Parks was injured from the accident. Cpl. Lane similarly testified that Parks was determined to be the driver of the SUV and that, other than Parks and Moore, no other individual indicated that they were injured.

Although Parks argues that there was a possibility that the airbags malfunctioned, we highlight Sgt. Farquhar's testimony that at the time of the accident, the airbags were "factory set and [sic] ready to work." Moreover, while Roberson testified that he pulled Parks from the passenger side of the SUV, the information garnered from the ACM, as Sgt. Farquhar testified, revealed that: (1) the only registered passenger in the SUV was the driver; (2) the driver's seat belt was unbuckled; (3) the passenger seat was vacant from anyone over 65 pounds; and (4) only the driver's airbag deployed. Sgt. Farquhar also indicated that in order for the passenger airbag to deploy, the vehicle must detect a passenger weight greater than 65 pounds, otherwise the airbag will be suppressed, and in this case, only the driver's side airbag deployed. Further, despite Roberson's statement that he saw Parks in the passenger seat of the SUV at the time of the accident, the jury, when

14

presented with the totality of the evidence before it, discounted Roberson's testimony and concluded that Parks was the driver.

Accordingly, after viewing this evidence in the light most favorable to the prosecution, we find that the State presented sufficient evidence, beyond a reasonable doubt, that any rational trier of fact could conclude that Parks was the driver of the SUV.

*Excessive Sentence*

In his second assignment of error, Parks alleges that his sentence was excessive and violated the 8th Amendment prohibition against cruel and unusual punishment. Specifically, he argues that the trial court failed to provide a sufficient factual basis for the imposition of his sentence and tailor his sentence to the specific offense.

Appellate review of sentences for excessiveness is a two-prong inquiry. Under the first prong, the record must show that the trial court considered the factors in La. C. Cr. P. art. 894.1. The primary goal of La. C. Cr. P. art. 894.1 is for the court to articulate the factual basis for the sentence imposed, and not simply mechanical compliance with its provisions. However, if the record reflects that the trial judge adequately considered the guidelines of the article, then he is not required to list every aggravating or mitigating circumstance. *State v. Smith*, 433 So. 2d 688 (La. 1983); *State v. DeBerry*, 50,501 (La. App. 2 Cir. 4/13/16), 194 So. 3d 657, *writ denied*, 16-0959 (La. 5/1/17), 219 So. 3d 332.

Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. *State v. Lanclos*, 419 So. 2d 475 (La. 1982); *State v. DeBerry, supra.* In sentencing, the important elements

15

which should be considered are the defendant's personal history (age, familial ties, marital status, health, employment record), prior criminal record, seriousness of the offense, and the likelihood of rehabilitation. *State v. Jones,* 398 So. 2d 1049 (La. 1981); *State v. DeBerry, supra.* There is no requirement that specific matters be given any particular weight during sentencing. *State v. DeBerry, supra*; *State v. Shumaker*, 41,547 (La. App. 2 Cir. 12/13/06), 945 So. 2d 277, *writ denied*, 07-0144 (La. 9/28/07), 964 So. 2d 351.

Next, under the second prong of the analysis, the court must determine whether the sentence is constitutionally excessive. A sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Dorthey*, 623 So. 2d 1276 (La. 1993); *State v. Mandigo*, 48,801 (La. App. 2 Cir. 2/26/14), 136 So. 3d 292, *writ denied*, 14-0630 (La. 10/24/14), 151 So. 3d 600. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. *State v. Weaver*, 01-0467 (La. 1/15/02), 805 So. 2d 166; *State v. Hollins*, 50,069 (La. App. 2 Cir. 8/12/15), 174 So. 3d 710.

When determining whether a defendant's sentence is excessive, a reviewing court should compare the defendant's punishment with the sentences imposed for similar crimes by the same court or other courts. *State v. Johnston*, 50,706 (La. App. 2 Cir. 6/22/16), 198 So. 3d 151, *writ granted on other grounds*, 16-1460 (La. 6/5/17), 221 So. 3d 46; *State v. Ferguson*, 44,009 (La. App. 2 Cir. 2/25/09), 4 So. 3d 315.

16

A trial court maintains wide discretion to sentence within the statutory limits. Absent a showing of manifest abuse of such discretion, a sentence will not be set aside as excessive. Upon review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. *State v. Weaver*, *supra; State v. Davis*, 50,149 (La. App. 2 Cir. 11/18/15), 181 So. 3d 200. As a general proposition, maximum or near maximum sentences are reserved for the worst offenders and the worst offenses. *State v. Hogan*, 47,993 (La. App. 2 Cir. 4/10/13), 113 So. 3d 1195, *writ denied*, 13-0977 (La. 11/8/13), 125 So. 3d 445.

The penalty for conviction of vehicular homicide is a fine of not less than $2,000 nor more than $15,000 and imprisonment with or without hard labor for not less than 5 years nor more than 30 years, with at least 3 years of the sentence to be served without benefit of probation, parole, or suspension of sentence. If the offender was previously convicted of a violation of La. R.S. 14:98, then at least five years of the sentence of imprisonment shall be imposed without benefit of probation, parole, or suspension of sentence. The court shall require the offender to participate in a court-approved substance abuse program. La. R.S. 14:32.1(B).

In the case *sub judice*, the trial court sentenced Parks to 25 years at hard labor, with the first five years to be served without benefit of probation, parole, or suspension of sentence, as well as a $2,000 fine. Parks argues that the trial court sentenced him without the benefit of a PSI or consideration of his record, and therefore, made no effort to particularize this sentence to him as an offender. Accordingly, he argues that his sentence should be set aside and remanded for resentencing.

17

After a thorough review, we find that the record does not clearly reflect the trial court's reasons for imposing Parks' sentence. Specifically, we note that the sentencing colloquy does not show that the trial court clearly considered the sentencing factors under La. C. Cr. P. art. 894.1 in particularizing the sentence to Parks. Although the trial court reviewed Parks' prior convictions, it did not discuss any personal information regarding Parks' background, including personal life, education, employment, family, or any other similarly relevant facts. The trial court provided:

> . . . the Court is required to consider Code of Criminal Procedure Article 894.1A, paragraphs (1), (2)[,] and (3). I find all three applicable to this case. Also, considering the aggravating and mitigating factors of Article 894.1(B), the Court has found that the offense resulted in a significant permanent injury or significant economic loss to the victim or her family. I find no other aggravating circumstances or mitigating circumstances contained in that article. [sic] Parks, this is a difficult decision. It's tough to do. I thought long and hard about it. It's going to be the sentence of the Court that you serve 25 years at hard labor. Five years will be served without benefit of parole, probation[,]or suspension of sentence. You'll be fined $2,000. Your fine and costs will be collected through inmate banking. This sentence will run consecutive to any other sentence that you may be subject to. You'll be given credit for any time you have served.

While we recognize that La. C. Cr. P. art. 875 does not mandate a PSI, we highlight that the record would contain more information about Parks relevant to tailoring an appropriate sentence if a PSI had been ordered.

Although the lack of a PSI does not alone provide a basis for vacating Parks' sentence, we find that the trial court only recited a conclusory consideration of the factors in art. 894.1(B). While a trial court is not required to consider each and every factor or give certain weight to specific factors, the record reflects that the trial court only mentioned one

18

aggravating factor, that "the offense resulted in a significant permanent injury or significant economic loss to the victim or her family," and while it noted that no other aggravating or mitigating factor applied, it did not refer to any of the specific aggravating or mitigating circumstances it found inapplicable.

Similar to this Court's analysis in *State v. Trotter*, 54,496 (La. App. 2 Cir. 6/29/22), 342 So. 3d 1116, wherein the defendant was similarly sentenced without full consideration of his personal history and the factors under art. 894.1, we also find that the only information we know about Parks is his age[8] and his prior convictions. In order to properly review this assignment of error, this court requires more information to adequately determine if the sentence was particularized to Parks as an offender. Accordingly, this court pretermits discussion of whether the sentence imposed in this case is excessive and remands this matter to the trial court to provide its reasons for the imposed sentence in consideration of the art. 894.1 factors.

*Error Patent*

Our review of the record has also revealed that, in sentencing, the trial court inadvertently omitted a portion of Parks' sentence under La. R.S. 14:32.1, which provides that the trial court "shall require the offender to participate in a court-approved substance abuse program and may require the offender to participate in a court-approved driver improvement program." Accordingly, this matter should be addressed by the trial court at the next hearing regarding Parks' sentencing.

---

[8] We note that this Court is aware of Parks' age from a full review of the record; however, his age was not discussed during sentencing.

19

## CONCLUSION

For the foregoing reasons, Parks' conviction is affirmed, and we remand the matter to the trial court for resentencing with the aforementioned considerations.

**CONVICTION AFFIRMED; SENTENCE VACATED; REMANDED FOR RESENTENCING.**